WILLIAM BLISS et al.

*v.*

LINDEN CEMETERY ASSOCIATION et al.

[Submitted June 10th, 1914.   Decided July 1st, 1914.]

1. Where certain individuals conceived the idea of establishing a large cemetery, and to carry out the scheme arranged to buy the real estate, procure the consent of the township and state board of health to its establishment, and prepare all the necessary papers and documents to carry the scheme through, they were "promoters," and, as such, bound to furnish the cemetery corporation with an independent and disinterested board of directors, and to make a full, open, and fair disclosure to such board of all the profits the promoters designed to make out of the scheme.

2. Rural Cemetery Association act (*1 Comp. Stat. 1910 p. 375 § 10*), providing that at least one-half of the proceeds of all sales of cemetery lots shall be appropriated to payment for the lands acquired by the association, until the whole price shall be paid, and the residue thereof applied to the preservation, improvement, and embellishment of the cemetery grounds, &c., and to defray the incidental expenses of the establishment, and that after the payment of the purchase-money and the debts contracted therefor, &c., the proceeds of all future sales shall be devoted to improvement, and to no other purpose or object so long as the embellishment of the cemetery is incomplete, deprived a corporation organized thereunder of the power to divide the proceeds of burial lots into shares, and give to the holders thereof a *pro rata* lien and claim on the land-purchase fund of the association, composed of at least one-half of the proceeds of the sales of all burial lots on the grounds of the association, &c.

3. *P. L. 1911 p. 626*, supplementing Rural Cemetery Association act of April 9th, 1875 (Revision 1877, page 102), and providing that any and every contract previously entered into by any cemetery association incorporated thereunder, by the terms of which land has been or was to be purchased by the association, and the price fixed at the amount of not more than half of the proceeds of all sales of lots, all moneys remaining of the other half to be expended for the embellishment of cemeteries, and certificates evidencing interest in such purchase price and proceeds are validated, &c., applied only in cases of purchase in which the purchase price was fixed at an amount not more than one-half of the proceeds of all sales of lots or plots, and did not validate a contract in which sixty per cent. of the proceeds were pledged for the payment of the purchase price.

4. *P. L. 1913 p. 521* is entitled "An act concerning cemetery corporations and contracts made by them with respect to interests in the proceeds of sales of lots or plots," section 3 declaring that any agreements or arrangements previously made by any cemetery corporations contained in deeds conveying lands to such associations, &c., and any certificates of interests in proceeds of sales of lots or plots, issued in pursuance thereof, not in contravention of the provisions of the act, are declared valid and affirmed, and section 5 declaring that the act shall take effect immediately, and that, if any portion thereof is invalid, it shall not affect any other portion.—*Held*, that, though section 3 should be held to be retrospective in operation, the statute should not be held to impair the vested right of complainants to the right to vacate an *ultra vires* contract dividing the proceeds of the sales of the lots of a cemetery association into shares and transferring the same, which right complainants had at the time of filing their bill for such relief.

5. Where promoters of a cemetery corporation had not provided it with an independent board of directors, and had fraudulently induced it to enter into an *ultra vires* contract for the disposition of the proceeds of sales of lots for cemetery purposes, such contract could not be ratified by a resolution of a subsequent board, nor by the shareholders at a subsequent meeting, especially where it did not appear that prior to such alleged ratification they were informed of all the facts.

6. A covenant by a cemetery corporation organized as provided by Rural Cemetery Association act (*1 Comp. Stat. 1910 p. 375*), obligating the corporation to pay semi-annually, in cash, to a promoter one-tenth of the gross proceeds of the sale, lease, or loan of burial plots having been obtained by the promoter deceiving his own uninterested board of directors, was fraudulent and *ultra vires*.

7. A covenant by a cemetery corporation organized under Rural Cemetery Association act (*1 Comp. Stat. 1910 p. 375*), binding it, as to a promoter, not to divest itself of the title to any part of its lands, with certain exceptions, without the written consent of the promoter, his heirs, executors and assigns, and in every case to pay one-tenth of the gross proceeds to such promoter, was void as *ultra vires* and in restraint of alienation.

8. Where a cemetery corporation covenanted with the grantor of its land, who was its chief promoter, that fifteen acres should be set aside to

provide a fund for perpetual care of the cemetery grounds, the land to be selected by the grantor and three other members of the board of trustees to be appointed by him, he having died without making any appointment or selection of plots, the covenant became obsolete.

9. A cemetery corporation, though without express power to borrow money to meet necessary expenses of its activities, has implied power to do so, and certificates of indebtedness and notes executed for money actually loaned to and received by the corporation constitute valid evidences of indebtedness against it.

On final hearing on bill, answer, replication and proofs.

*Mr. Abram H. Cornish,* for the receiver.

*Mr. Terry Parker,* for the defendants Henry A. Boehl et al., shareholders.

*Mr. Hugh Reed,* for Walter P. Vining, Robert M. Crater and R. Judd, loan certificate holders.

*Mr. H. Theodore Sorg* (representing *Burnet & Cornish*), for D. Frederick Burnet, guardian for Irene Smith, Elaine Smith, Marie Smith, Carlton O. Smith and Lillian O. Smith, infants.

*Mr. Borden D. Whiting,* for the shareholders.

*Mr. Robert D. Reynolds,* for Hedley V. Cook et al., trustees, and for the defendant Cemetery Association.

HOWELL, V. C.

The theory of the original bill was that the provisions of our Corporation act, relating to insolvent corporations, applied to corporations organized under our Rural Cemeteries act and the supplements thereto. This was found to be incorrect. *Bliss* v. *Linden Cemetery Association, 81 N. J. Eq. 394.* An amended bill was then filed whose object and purpose was the administration of the affairs and property of the defendant as a corporation holding the legal title to real estate in trust for a charitable use. The bill alleges many *ultra*

*vires* and other illegal transactions and prays generally that the irregularities may be corrected and the illegal and *ultra vires* acts set aside.

The evidence is that in the year 1900, or thereabouts, William F. Smith and Clinton O. Smith, with possibly one or two other persons, conceived the idea of establishing a large cemetery on lands adjoining the Pennsylvania railroad in the township of Linden, in Union county. Subsequently, Rosswell D. Benedict and Vernette Prentice joined them, and these four men thereupon became the promoters of the enterprise. Whatever was done towards carrying the scheme into operation was originated and carried on by them. They formulated the plan, arranged to buy the real estate, provided a scheme by which the purchase-money was to be raised in the first instance, procured the consent of the township of Linden and of the state board of health to the establishment of a cemetery and prepared all the papers and documents which were necessary in order to carry it through. This series of acts constituted these four men promoters of the enterprise and subjects them to all the liabilities and responsibilities placed upon promoters by our law. *Woodbury Heights Land Co.* v. *Loudenslager, 55 N. J. Eq. 78; affirmed, 58 N. J. Eq. 556; Plaquemines Tropical Fruit Co.* v. *Buck, 52 N. J. Eq. 219; Dickerman* v. *Northern Trust Co., 176 U. S. 181; Pittsburgh Mining Co.* v. *Spooner, 74 Wis. 307.*

Among the other duties imposed upon promoters of an enterprise of this character is the furnishing of an independent and self-disserving board of directors, and a full, open and fair disclosure of all the profits which the promoters design to make out of their promotion scheme. These questions were examined by me in the case of *Arnold* v. *Searing, 78 N. J. Eq. 146,* and I call particular attention to the quotation from the opinion of Lord O'Hagan in *New Sombrero Phosphate Co.* v. *Erlanger, 3 A. C. 1218; 48 L. J. Ch. 73,* as to the independence of directors, and the remarks of Lindley, master of the rolls, *In re Olympia, Ltd., L. R. 1898; 2 C. D. 153; 67 L. J. Ch. 433,* as to the disclosure of intended profits.

There can be no doubt but that these four men, until the death of William F. Smith, and after that event the remaining

three men, had full charge and control of the business conducted by the association. They selected the trustees and qualified them by giving to each the legal title to a cemetery lot in order that they might be ostensible lot owners, which lots they were severally required to retransfer to the corporation whenever they ceased to occupy the position of trustee. Out of the whole number of persons who occupied the position of trustees of the defendant association from 1900 until the present time only two or three, as I remember the evidence, were qualified by an absolute and *bona fide* ownership of cemetery lots. Early in its history the vendors of the real estate, or some of them, acted as trustees, but apparently they had no interest except to see to it that the mortgages taken back by them for a portion of the purchase-money were protected and paid. It therefore appears to be quite evident that the promoters did not furnish to this corporation an independent and self-disserving board of trustees, but, quite on the contrary thereof, so managed as that the board was continuously under their control and domination.

After the formal execution and filing of the incorporation papers, the first step toward a consummation of the plan was the actual purchase and conveyance of the real estate to be used for cemetery purposes which had some time before been bargained and arranged for by these promoters. The deed of conveyance to the association was made on January 29th, 1901. Up to this time there was no one interested in the project except the promoters; there were no lot holders or creditors or holders of shares in the plan that was afterwards adopted. The scheme was confined to the four promoters, and no other individual had any interest in it. The resolution for the purchase of the real estate was passed on January 16th, 1901, by the persons who had been selected by the promoters as trustees. It recited that William F. Smith had proposed to sell to the association one hundred and twenty-nine acres of land situated in Linden, Union county, for the purposes of said association, on condition that the association issue to the said William F. Smith, in exchange for his deed conveying his equity in said land and property to the association, nine thousand shares in the purchase-

money fund of said association, to be realized by contribution thereto under the laws of the State of New Jersey of one-half the proceeds arising from the sale by the association of plots in said premises. The resolution following this preamble reads as follows:

"*Resolved,* That the association purchase the property offered by the said William F. Smith and issue to him *therefor as full consideration for his equity* therein nine thousand shares in the purchase-money fund of this association to be made up of one-half of the proceeds from the sale or use of plots as authorized by the laws of the State of New Jersey, this association assuming any mortgage or other encumbrances on said property existing over and above the equity of said William F. Smith therein, which mortgage shall not exceed the sum of $     to be dealt with by the association in the future as this association may be advised;

"*And be it further resolved,* That the president and treasurer of this association be and they hereby are authorized and directed to execute a contract on the part of this association with said William F. Smith agreeing to accept from him a deed of the said property and to deliver to him in exchange for said deed nine thousand shares in the purchase-money fund of this association made up as specified in the next preceding resolution, and to execute any other contract with reference to the said deed that they may deem necessary."

It will be observed that the only consideration agreed by this resolution to be paid by the association to William F. Smith is nine thousand shares in the purchase-money funds. At that time the situation of the property in question as to encumbrances was this: Smith paid for the property $37,500, subject to mortgages aggregating $32,000, leaving as his equity only $5,500.

If the letter of the resolution is to be followed the cemetery association would receive title to this small equity upon issuing to him nine thousand shares to represent the $5,500. I have been careful to state this part of the transaction in detail because, as a matter of fact, this plan was not followed in any respect, but was promptly departed from by the terms of the deed which was delivered a couple of weeks later.

On January 29th, 1901, William F. Smith conveyed to the association three tracts of land aggregating one hundred and thirty-one acres: the conveyance was stated to be in consideration of five certain covenants therein set forth and entered into by the party of the second part. The covenants are as follows:

"1. To deliver to said William F. Smith, nine thousand shares of the Linden Cemetery Association made out in the name of C. O. Smith at the ensealing and delivery to it by said first parties of this indenture, said shares giving the holders thereof their *pro rata* lien and claim upon the land-purchase fund of said association, composed, under the laws of New Jersey, of at least one-half of the proceeds of the sale of all burial plots in the grounds of said association conveyed to it by these presents for conversion into burial plots.

"2. To pay semi-annually in cash to said William F. Smith, his heirs, administrators, executors and assigns, one-tenth part of the gross proceeds of the sale, lease or loan of each burial plot or of any use thereof or interest therein, made by said Linden Cemetery Association, party of the second part, from the land hereinafter conveyed to said association by this indenture.

"3. To sell, lease or loan or in any other way to divest itself of any part of its title to or possession of no portion of the lands hereinafter conveyed to it, in any other form or for any other use than as burial plots, except for the purpose of straightening its lines or conforming to some regulation imposed upon it by law, without the consent in writing of the said William F. Smith, his heirs, executors, administrators or assigns; and in every case to pay one-tenth of the gross proceeds thereof to the said William F. Smith, his heirs, assigns, executors or administrators.

"4. To set apart at least fifteen acres, under the direction and in conformity with the wishes of said William F. Smith and any three of the trustees of said association whom said Smith shall appoint to act with him in the premises, such fifteen acres not necessarily being in one solid tract, but possibly made up from various parts of the lands hereinafter conveyed, from which fifteen acres no burial plot shall be sold at less than two and one-half dollars per square foot, the proceeds from the sale of burial plots in which as they are made, after deducting the one-half thereof required by law, to be distributed among the shareholders, and the one-tenth thereof to be paid to said Smith, his heirs or assigns as hereinbefore provided, shall be lodged with some trust company to be selected by said Smith and the three trustees aforesaid, and shall remain on investment with said trust company, under a trust deed approved by said Smith and his said advisers, until the said proceeds and the accumulations thereof shall have made a fund sufficient to provide an income adequate to the perpetual maintenance of the lands hereinafter conveyed as a high class cemetery, and such income shall be applied to such maintenance when the exhaustion of burial plots shall cause to cease the fund for embellishing and maintaining such cemetery theretofore derived from forty per cent. of the proceeds of burial plots not within said fifteen acres, the purpose of this provision being to insure the perpetual care of the said cemetery and its maintenance as a park when its capacity as a burial place shall have become exhausted. If there should remain any portion of said fifteen acres unsold as burial plots at the time when such trust fund had become sufficiently large to afford an income adequate to such cemetery maintenance, then the party of the second part covenants and agrees, after paying to the share-

holders one-half of the proceeds of future sales of burial plots from said fifteen acres, to pay over the balance thereof to the said William F. Smith, his heirs, executors, administrators and assigns. And the party of the second part further covenants and agrees to defray from such trust fund the expenses of the removal and reburial in lots also purchased from such fund of any bodies directed by law to be removed from the said land hereinafter conveyed, if such bodies shall have remained buried in said land for the space of twenty-five years.

"5. As a fifth and final covenant and consideration for the conveyance to it of said land hereinafter described, the party of the second part agrees to assume all mortgage or other encumbrances on the land hereinafter conveyed to it and to hold the parties of the first part, their heirs, executors and administrators forever harmless therefrom."

Inasmuch as the matters which are complained of by the complainant arise principally out of one or another of the foregoing covenants I shall take them up and discuss them *seriatim.*

It may not be amiss to say at this point that the most superficial examination of the deed containing the above-recited covenants as delivered discloses that it has a very slight resemblance to the document which the minute book shows was negotiated for by the association. This fact accentuates the remarks made by the eminent judge above quoted touching the independent directorate and demonstrates the actual control which the promoters had over the non-interested board.

The first covenant relates to the creation and disposition of what is known as the land-purchase shares. These are supposed to have been authorized by section 10 of the Rural Cemetery Association act. *Comp. Stat. p. 375 § 10,* as amended by an act found in *P. L. 1882 p. 25.* This section provides that one-half at least of the proceeds of all sales of lots or plots shall be first appropriated to the payment of the purchase-money of the land acquired by the association until the whole purchase-money shall be paid; and the residue thereof to preserving, improving and embellishing the said cemetery grounds and the avenues and roads leading thereto, and to defray the incidental expenses of the cemetery establishment; and that after the payment of the purchase-money and the debts contracted therefor and for surveying and laying out the land, the proceeds of all future sales shall be applied to the improvement, embellishment and preservation of said cemetery, and for incidental expenses, and to no

other purpose or object as long as such embellishment is in-complete.

The shares were issued in the following form:

"This is to certify that         is entitled to         shares in the Linden Cemetery Association, of New Jersey, transferable only on the books of the association in person or by attorney, on surrender of this certificate.

"This certificate is a lien on the land-purchase fund of the association, which fund, under the laws of New Jersey, must be composed of at least one-half of the proceeds from the sale of burial plots in the said cemetery; and the holder hereof is entitled to have paid over to him one 1/9000th part of ·said fund for each share which this certificate represents; and he will be so entitled until the last burial plot in said cemetery is sold and its proceeds distributed according to law.

"In witness whereof, the said Linden Cemetery Association has caused this certificate to be signed by its president and treasurer," &c.

A scheme of issuing share certificates quite similar to the one now before the court was dealt with by Vice-Chancellor Stevens in the case of *East Ridgelawn Cemetery Co.* v. *Frank,* 7l7 *N. J. Eq. 36,* and was pronounced by him to be entirely outside of the authority conferred by the statute above referred to. He held that the statute contemplated the purchase of the land for a definite price, and that consequently the shares, if shares could be issued at all by the association, must be predicated upon some definite and fixed amount. The remarks and criticisms made by the vice-chancellor in that case apply with peculiar force to this case, and I have no hesitation in saying that the scheme here entered into is extra-statutory and cannot be carried out in accordance with the original intention of the parties. There must be an inquiry as to the fair market value of the land in question at the date of the purchase, and if the issue of shares is to be approved they must be based upon actual values at that time and not upon such values as may subsequently be reached when the cemetery lots shall have become much more valuable by reason of the more extensive use of the burial ground. The scheme of issuing shares was one of the methods by which the promoters obtained an undisclosed profit to themselves, and in so far as it aided and assisted in this design, it is fraudulent and void. The association cannot be made chargeable with anything

which it did not lawfully receive. The land-purchase fund was divided into nine thousand shares—that is to say, each shareholder was entitled to receive for each share held by him one nine thousandth part of the proceeds of the sale of all the lots which were sold by the association for burial purposes. Five thousand of these shares were turned back by the promoters to the corporation and were sold by it to raise money with which to pay off the mortgage on the property, and the remainder represented the secret profit made by the promoters out of the enterprise. The association must recognize a liability of some sort for the money actually received by it from the land-purchase shares or from any other source, but it cannot be made to respond to claims arising out of the issue of land-purchase shares from which it received no benefit. Therefore, the claims of so-called shareholders which brought no money to the treasury of the company are void and cannot be enforced. The so-called shares have no negotiable quality, and title does not therefore pass by delivery or endorsement. The doctrine of protection which is afforded to *bona fide* purchasers without notice and for value does not apply, and every purchaser and holder of the four thousand shares must be held to have known that they were issued without the sanction of any law. In so far as these so-called shares can be traced to the promoters, and from them to the present holders, they must be canceled.

After the decision in *East Ridgelawn Cemetery Co.* v. *Frank, 77 N. J. Eq. 36,* it was quite evident that schemes like the present were in great danger. In 1911 and 1913 acts were passed by the legislature whose undoubted purpose was to cure any defects that there might be in this plan of financial organization; and an able argument was addressed to the court in favor of the view that the legislature had now sanctioned the plan in question, if, indeed, it had ever been open to question.

But it is doubtful whether the so-called curative acts of 1911 and 1913 (*P. L. 1911 p. 626; P. L. 1913 p. 521*) have any effect whatever upon the situation developed in this case. It is quite clear that the act of 1911 does not. It applies to only one class of cases—that is, cases of purchase, in which the purchase price

is fixed at the amount of not more than one-half of the proceeds of all sales of lots or plots, &c., thus excluding this case, in which sixty per cent. of the proceeds of lots were pledged for the payment of the purchase-money. The act of 1913 is a general act and not a supplement to the Rural Cemeteries act, the first two sections of which must undoubtedly be construed to be prospective in their operation. *Frelinghuysen* v. *Morristown,* 77 N. J. *Law 493.* The fourth section relates only to joint agreements, so that whatever there is in the act which relates to the case in hand is found in the third section. Concerning that section there are two things to be said—*first,* its operation is limited by the words "not in contravention of the provisions of this act." Just what that may mean is very difficult of solution. . Its sponsors evidently considered it to be difficult, because they put in the fifth section a provision that if any portion of the act should be held to be invalid it should not affect any other portion; and *second,* if the act means what it appears to say, then it is possible for a cemetery company to pledge all its lots and all the proceeds of the sale thereof for the payment of purchase-money, and thus abrogate what has been the settled policy of our legislature since 1877. But even if the third section should be found to be clearly retrospective, yet it could not affect the vested rights of any interested person, and this act so construed would have the effect of depriving the complainants of a remedy which they had at the time of the filing of the bill. Any act which has the effect of impairing the obligation of a contract or of depriving the party of a remedy which existed when the contract was made, is obnoxious to the provisions of our constitution, and therefore void. *Baldwin* v. *Newark,* 38 N. J. *Law 158; Maxwell* v. *Goetschius,* 40 N. J. *Law 383; Moore* v. *State,* 43 N. J. *Law 243; Presbytery of Jersey City* v. *First Presbyterian Church,* 80 N. J. *Law 577.* I, therefore, conclude that the so-called curative acts have no application to the case in hand, and that the case must be decided as if no such legislation existed.

An attempt was made to ratify the land purchase and the form of the deed by which the land was conveyed to the association at a meeting of the board of trustees held on January 31st, 1901.

The board which attempted this ratification was as powerless to act in the matter as was the board which passed the original resolution; hence, ratification by it wrought no result whatever, and the situation, after January 31st, 1901, was exactly the same as the situation before that date. Besides, it is impossible to ratify a fraud and make that good which is vicious from the foundation. Neither does it appear that at the time this ratification was sought there was any disclosure made to the board of the contents of the deed in question. On this point, see *Booth v. Land Filling Co., 68 N. J. Eq. 536; Siegman v. Electric Vehicle Co., 72 N. J. Eq. 409.*

Still another attempt was made to procure a ratification of the deed and the issue of nine thousand shares in the land-purchase fund, and the organization, at a meeting of lot holders held on March 13th, 1901, at which it was resolved by them to ratify and confirm the acts of the officers and agents of the association in any way connected with the acquirement of the said property, and especially to recognize the nine thousand shares delivered as part consideration for said property, and all agreements, covenants, bargains and promises contained therein and in said deed, as their free act and deed, adopting all of the same as fully by that resolution as if their names had been subscribed thereto and their seals thereto affixed. But it does not appear that the lot holders were informed at that time of the contents of the deed or of the general situation. It was the duty of the promoters to make such disclosures concerning their profits as would reach the persons who afterward became lot holders. Future purchasers of lots had a right to know just what the condition was. The burden of proof on this point is on the promoters. There is not only a deficiency of proof on their part, but quite on the contrary thereof, all the lot holders who were called to testify to this point stated that at the time they purchased their lots they knew nothing about the ten per cent. interest or anything about the financial condition of the association. There can be no ratification without full knowledge on the part of him who ratifies, and all these attempts lack one essential element, viz., a full and complete disclosure of all the facts concerning which the ratification is asked.

I, therefore, conclude that there has been no efficient ratification by any competent authority to sustain the acts which are now complained of.

The second covenant, which creates what was called in the case the "10 per cent. interest," rests upon a much less secure foundation even than does the so-called shares. There is absolutely no statutory or other authority for the making of such a covenant. It is not mentioned in the resolution by virtue of which the lands were purchased, and no display of it appears ever to have been made by the promoters. By virtue of this covenant the association is claimed to have bound itself to pay William F. Smith, the grantor, one-tenth of the gross proceeds of the sale, lease or loan of burial plots in the cemetery. In forcing this deed and this covenant on the cemetery association, Smith seems to have deceived even his own board of uninterested directors. That ten per cent. interest, early in the history of the cemetery association, was divided into four shares, which are now distributed as follows: One-fourth to William F. Smith, now held by his personal representatives; one-fourth to Dorothy A. Raymond, who subsequently married Roswell E. Benedict; one-fourth to Clinton O. Smith, a son of William F. Smith, and one-fourth to Vernette E. Prentice. Not only should this covenant be wholly disallowed upon the ground that it was fraudulent in fact, but also upon the further ground that it was a means by which a secret profit was obtained by the promoters of the enterprise, and not only should the covenant be set aside on these grounds, but the promoters, if they have received any benefit thereunder, should account to the cemetery association therefor.

The third covenant binds the cemetery association not to divest itself of the title to any part of the lands in question (with negligible exceptions) without the consent in writing of William F. Smith, his heirs, executors, administrators and assigns, and in every case the association to pay one-tenth of the gross proceeds thereof to the said Smith. This provision is not authorized by the statute, is not mentioned in the original resolution for the purchase of the land, and is a restraint upon

alienation, and is therefore void. *Magie* v. *German Evan. Church, 13 N. J. Eq. 77; affirmed, 15 N. J. Eq. 500.*

The fourth covenant relates to setting aside of fifteen acres of the cemetery land for the purpose of providing a fund for the perpetual care of the cemetery grounds. This land is to be selected by Smith in conjunction with any three members of the board of trustees of the association whom Smith shall appoint to act with him in the premises. Inasmuch as Smith, the grantor, has died without making any appointments of trustees or selection of plots for the purposes of the covenant, it would seem as if the provisions of the covenant have become obsolete, there being now no one who can appoint the trustees, and there being no trustees to make the selection. In my opinion, nothing can be done on behalf of either the grantor or grantee with relation to this covenant.

The fifth and last covenant is an assumption by the cemetery association of the mortgages then on the land amounting to $32,000 of principal. Inasmuch as these mortgages have been paid off and discharged of record there seems to be nothing in this covenant for the consideration of the court.

During the ten years or thereabouts that this cemetery association has been in operation it has been subjected to a continual loss, for the reason that the regular income from the sale of lots after deducting sixty per cent. thereof for the land-purchase shares and the ten per cent. interest, was insufficient to meet the necessary expenses of conducting the business. The board of trustees, therefore, authorized the borrowing of money on what is known as loan certificates issued in denominations of $100, $500, $750 and $1,000, whereby the association promised to pay, upon a certain date expressed in each certificate, the face value thereof, with six per cent. interest, semi-annually, it reserving the right to redeem the same on any interest day at one hundred and two and interest; there were three issues authorized, one in 1902, another in 1906, and still another in 1910, the aggregate amount authorized being $100,000, only $84,900 of which have been issued. These certificates represent actual cash loaned and paid to the cemetery association, with the exception that certain of the certificates were issued to cer-

tain of the trustees at a discount of ten per cent. It was argued that inasmuch as there appeared to be no express power granted to cemetery associations to borrow money, such borrowing could not take place lawfully, and if it did take place, it was *ultra vires,* and therefore void. This contention, however, is not in accordance with the authorities. The right to borrow money to carry on the objects and purposes of the corporation is implied from the authority to do business as a corporation. It was supposed on the argument that there was a difference between the ordinary business corporation and a cemetery corporation in this respect; but no difference is recognized in the leading case decided by our court of errors and appeals in 1886. *Fifth Ward Savings Bank* v. *First National Bank, 48 N. J. Law 513.* There Mr. Justice Depue holds that every corporation created for transacting business, unless restrained by its charter, or some statute, has, as a necessary incident, the power of incurring debts in the course of its legitimate business, and of making and endorsing negotiable paper in payment of such debt. See, also, *Lucas* v. *Pitney, 27 N. J. Law 221; National Bank* v. *Young, 41 N. J. Eq. 531; Hackettstown* v. *Swackhammer, 37 N. J. Law 191.* So long as the borrowing of money is for the legitimate purposes of the association the act is *intra vires,* and therefore valid, but the argument against these certificates is foreclosed by the Cemetery act itself, which recognizes the fact that a cemetery company may contract debts, and in section 16 it provides a drastic method by which such a corporation can be compelled to pay debts contracted by it out of its profits. If it could not contract debts there would be no need of any method of collecting debts from it because there could be none to collect. The implication of power, therefore, seems to be complete. These certificates must stand as debts or obligations of the association for the amounts respectively advanced thereon by the original purchasers thereof. Not being negotiable instruments, a defect in the original issue will affect them in the hands of the present owners.

It likewise appears that the association owned promissory notes to the amount of $39,813. In so far as these notes represent money actually loaned to and received by the association,

they must be held to be its lawful obligations, and inquiry should be made by a master to ascertain the amounts due upon these various kinds of obligations; if, however, the notes which were testified to include the notes given by the company to the shareholders in lieu of the distribution of cash, such notes should be canceled; otherwise, the amount will stand as a double liability of the association.

These views lead to the following results:

(1) The four thousand shares taken by the promoters as a secret profit, in so far as they can be traced and recognized, must be canceled in the hands of their present owners.

(2) The five thousand shares which were donated to and sold for the benefit of the association must stand as five thousand shares in the actual value of the land at the time of its purchase, each of the four thousand shares being entitled to one nine-thousandth part of the proceeds of the sale of the lots; there will be a reference to a master to ascertain this actual value.

(3) The so-called ten per cent. interest will be canceled absolutely.

(4) There will be a reference to ascertain the amount actually owing by the association on the loan certificates and promissory notes. This amount when so ascertained shall be recognized as indebtedness of the association.

(5) The receiver will be requested and authorized to report to the court a scheme for the resettlement of the trust fund and the readjustment of the association's affairs.

If there are any other questions which need to be decided now they can be mentioned at the time of the settlement of the decree.