ESTHER ROTHENBERG, complainant,

*v.*

FRANKLIN WASHINGTON TRUST COMPANY et al., defendants.

[Decided June 14th, 1940.]

*Mr. Bernard Mindes* (*Mr. Israel B. Greene,* of counsel), for the complainants Esther and Jerome Rothenberg.

*Mr. Milton Unger,* for the defendant Franklin Washington Trust Co.

*Mr. Emil A. Trautman,* for the defendant Franklin Mortgage and Title Guaranty Co.

*Mr. Harry Schaffer,* guardian *ad litem* of the defendant Samuel A. Rothenberg, Jr., *pro se.*

*Mr. William H. Parry* and *Mr. Milton C. Tauder,* for the defendants Clara E. Rothenberg et al.

FIELDER, V. C.

Samuel Rothenberg created a life insurance trust wherein he named Franklin Washington Trust Co. (hereinafter called Trust Co.) as trustee, with direction to invest the proceeds of his insurance policies after his death, in legal investments for trust funds and to pay the income for life to his mother, his wife and his children, and to distribute the principal in the manner specified in the trust agreement. He died May 31st, 1932, and shortly thereafter the Trust Co. received $280,975.64 from insurance companies of which, after paying therefrom certain sums in accordance with the terms of the agreement, $267,788.47 remains as residue of *corpus.* Almost immediately after receiving the proceeds of the policies the Trust Co. invested the same in mortgages purchased from Franklin Mortgage and Title Guaranty Co. (hereinafter called Mortgage Co.). The bill of complaint herein was filed by the trustor's widow in June, 1937 (and thereafter amended) and named as defendants the Trust Co., the Mortgage Co., the trustor's mother and his two sons (then minors) and three individuals who have a contingent interest in the trust in the event that upon the death of the trustor's widow and mother there should be none of the trustor's children, or their issue, surviving. Jerome Rothenberg, one of trustor's sons, became of age shortly after the bill was filed and joined as a party complainant. The other son, Samuel Rothenberg, Jr., appeared by a guardian *ad litem* and filed an answer

joining in the prayers of the amended bill, as did also the trustor's mother and the three defendants having a contingent interest. All the Rothenberg beneficiaries will be referred to hereinafter as complainants.

In effect the bill charges that the mortgages in which the Trust Co. invested were not legal investments for trust funds and also were illegal and improper investments because (a) they were made in bad faith for the purpose of providing the Mortgage Co. with a cash fund to enable it to pay a $370,000 loan it owed the Trust Co.; (b) the investments were made without appraisement of the mortgaged property by the Trust Co. prior to making the investments; (c) the mortgages were in excess of sixty per cent. of the value of the mortgaged real estate; (d) the mortgages were not first liens on the mortgaged premises; (e) because of the corporate affiliations and interlocking relationship of stockholders, officers and directors between the Trust Co. and the Mortgage Co., they were improper investments for the Trust Co. to have made. The amended bill prays that the Trust Co. account for such investments and be removed as trustee.

The three counsel representing complainant and those allied with her, have filed separate voluminous briefs and reply briefs, wherein they severally discuss the same points on which all rely, use hundreds of unnecessary words in elaboration of those points, indulge in extravagant and intemperate language toward the Trust Co. and quote many pages of citations taken from text books and decisions of English courts and courts of our sister states, as well as those of our own courts, thus calling for a lengthy brief on behalf of the Trust Co. in answer to the many charges of bad faith made against it. When it is considered that the court has some 1,200 pages of testimony to read, some time of the court could have been saved had complainants collaborated on a single set of briefs containing concise argument on the points on which all rely, limiting citations in support of those points mainly to decisions of our own state, which I believe settle all questions of law here involved, and refrained from impertinent references to the Trust Co. which certainly add no strength to the arguments they advance. I disregard the brief filed by Mr. Stein

as guardian *ad litem* of defendant Samuel Rothenberg, Jr., because he was not appointed guardian for the purpose of the issues in this case.

In 1932, when the Trust Co. was called upon to invest the trust funds in its hands, it was authorized by law (*Comp. Stat. p. 3864 § 137*) to invest in bonds secured by first mortgage on real estate, provided the amount loaned thereon did not, at the time of making the loan, exceed sixty per cent. of the estimated worth of the real estate mortgaged, which provision, in substance, has been incorporated in *R. S. 3:16-1* (*f*). The Mortgage Co. was then in business of loaning money on bond and mortgage and selling the same to various purchasers. For the purpose of making the investments in question, the Trust Co. secured from the Mortgage Co. a list of mortgages available for investment and therefrom selected and purchased forty mortgages, each made by a separate obligor, each covering a one-family dwelling house premises in suburban localities, guaranteed by the Mortgage Co. as first liens thereon, and also guaranteed as to payment of principal and interest. Each mortgage was assigned to the Trust Co. absolutely, but as to thirty-five of them a contemporaneous agreement was entered into that the Trust Co., as absolute owner thereof, would hold a secondary interest therein for a specified amount for the benefit of the Mortgage Co., as if the Trust Co. held a first lien on the mortgaged premises for a definite amount and the Mortgage Co. held a subordinate lien thereon to the extent of a secondary interest. I cannot agree with complainants' contention that as to the thirty-five so-called senior mortgages the Trust Co. in effect invested in shares of mortgages, which investments were governed by statutes now incorporated in *R. S. 3:16-2* and *3*. Those statutes authorize trust investments in shares of mortgages and participation certificates for an equal *pro rata* interest in a group of mortgages deposited with a corporate trustee, and define the conditions under which such investments may be made. The mortgages in question were assigned by the Mortgage Co. to the Trust Co. as whole mortgages and the assignments were absolute transfers of every incident of ownership. By the contemporaneous agreement the Trust

Co. had authority to receive all principal and interest on the mortgages and to retain its priority share thereof and remit any balance to the Mortgage Co., and the Trust Co. had absolute power to release, cancel and foreclose the mortgages. The legislature of 1933 recognized and specifically authorized as proper this form of investment of trust funds (*R. S. 3:16-5*) and the same legislature validated and confirmed such investments theretofore made by a fiduciary in the exercise of good faith and reasonable discretion. (*R. S. 3:16-8*).

It seems to have been the general belief of fiduciaries, at least prior to the decision in 1937 in *Gates* v. *Plainfield Trust Co., 121 N. J. Eq. 460; affirmed, 122 N. J. Eq. 366,* that investments in parts of mortgages and in participation certificates were safe and proper investments for trust funds, and I think that in investing in the senior mortgages the Trust Co. followed a general practice which then obtained and acted in good faith, notwithstanding complainants' claim that the mortgages were purchased for the purpose of providing the Mortgage Co. with funds with which to discharge a debt of $370,000 it then owed the Trust Co. I do not find such claim supported by the evidence, which shows that the Mortgage Co. ended the year 1932 with a substantial cash balance and that none of the funds it derived from assignment of its mortgages to the Trust Co. was used (if indeed any was used) to apply on its debt to the Trust Co. earlier than March, 1933, and that the debt was finally liquidated in January, 1934.

Nor can I find from the evidence that the mortgages purchased were not first liens on the mortgaged premises, or that any exceeded sixty per cent. of the estimated worth of the real property mortgaged at the time they were purchased. The Trust Co. had the Mortgage Co.'s certificate and guarantee of title in each case and the only dispute seems to be whether, in some cases, unpaid taxes or water charges were liens prior to the mortgages but I do not find proof thereof. On the contrary it appears that when the Trust Co. took the mortgages each was a prior lien and none was then in default for principal, interest or taxes. Testimony of real estate experts produced by complainants was given seven years after the

mortgages were purchased, to the effect that the values of practically all mortgaged properties were, in 1932, much below a figure which could justify a mortgage loan purporting to be not in excess of sixty per cent. fair value, which testimony I regard as "hindsight" when compared with testimony I consider as showing satisfactorily that the Trust Co. had all mortgaged property appraised by four competent appraisers, who reported values of each parcel in an amount sufficient to justify a mortgage loan to an extent of sixty per cent. of each appraisal.

In purchasing the mortgages the Trust Co. relied on them as ample security for loans made on each mortgaged property and it took the guarantee of the Mortgage Co. as collateral or further security. It thus invested approximately $280,000. When the testimony in this case was concluded in June, 1939, it held $55,806.56 in mortgages, none of which were in default and on which all taxes were paid, and it had real estate appraised at $46,750 acquired through foreclosure of other mortgages. Approximately $165,000 of mortgage investments had been paid off and the proceeds invested in United States government securities having a present market value of about $173,000, and as yet no loss has been shown to the principal of the trust. The Mortgage Co. has lived through the business and real estate depression, is still doing business and its guarantee held by the Trust Co. is presumably good. In that situation we come to a remaining question touching the mortgage investments which is, should the Trust Co. be surcharged with the amount of mortgages and real estate it holds as part of its trust, on the theory that they represent investments improperly made because of corporate affiliations which existed between it and the Mortgage Co. at the time of the purchase of the mortgages?

In 1932 the Trust Co. had no stock interest in the Mortgage Co. It had twenty-four directors, and the Mortgage Co. had thirteen of whom six were directors of the Trust Co. The chairman of the board of directors and the vice-president of the Trust Co. held the same respective offices in the Mortgage Co. The executive committee of the Trust Co. took the initial corporate action looking toward purchase of the mort-

gages in question. Six members of that committee, of whom but one was a director of the Mortgage Co., attended a meeting at which purchase of the mortgages was authorized and the minutes of that meeting record that no member of the committee who was an officer or director of the Mortgage Co. voted for the purchase. Later in the same month a meeting of directors of the Trust Co. was held at which seventeen directors were present, of whom six were directors of the Mortgage Co. The minutes of that meeting record adoption by unanimous vote of all directors present and voting, of a resolution approving the action of the executive committee and that no officer or director of the Mortgage Co. voted for the resolution.

When the Trust Co. undertook administration of this trust it became bound by an inflexible rule of law applicable in every case, that one having a trust relation or obligation toward another shall not place himself in a situation in which he might be tempted to take advantage of his *cestui que trust*, and for any act in violation of the rule, no matter how pure his intention, such act is voidable at the instance of the person he represents. This rule was adopted long ago by our Court of Errors and Appeals. *Staats* v. *Bergen, 17 N. J. Eq. 554.*

Although I do not find that the Trust Co., acting through its directors, was actuated by any improper motive in purchasing the mortgages, the opportunity for some profit or advantage to itself and to some of its officers and directors, as well as for benefit to the Mortgage Co., was present. The Trust Co. was a creditor of the Mortgage Co. and the latter was a depositor in the Trust Co. The Trust Co. had a natural interest in increasing its debtor's liquid assets and, at a time when general banking conditions were bad, in maintaining the amount of its deposits by receiving back from the Mortgage Co. the purchase price of the mortgages. The Trust Co. in the performance of its corporate functions and duties, acted through its directors as its agents and they were in the position of trustees not only as to stockholders of their corporation, but also as to all persons with whom their corporation held a trust relation. Officers and directors of the Trust

Co. who were also officers and directors of the Mortgage Co. had a pecuniary interest as stockholders of the Mortgage Co. in the business and profits of the latter corporation and through them, as well as through the relation of debtor, creditor and depositor, close affiliation existed between the two corporations. In such situation, the directors of the Trust Co. were faced with the duty of investing the trust funds here in question and when they decided to purchase mortgages from the Mortgage Co., accompanied by the Mortgage Co.'s guarantees of payment of principal and interest, they had to consider whether at a future time they might not be called on to enforce the guarantees, an action which would materially affect the interests of members of the board who were officers and directors of the Mortgage Co., and it might be mentioned that the Trust Co. has not taken action on such guarantees, at least so far as they apply to mortgages which the Trust Co. foreclosed and under which it became owner of mortgaged real estate carried in the trust at a value of $46,750. Thus when directors of the Trust Co. voted to invest the money of this trust in securities taken over from the Mortgage Co., they had dual interests to consider and serve and, as all the cases point out, a trustee cannot serve two masters whose interests may be in conflict and the complainants have an absolute right to disavow such investments (*Staats* v. *Bergen, supra; Stewart* v. *Lehigh Valley Railroad Co., 38 N. J. Law 505; Shanley's Estate* v. *Fidelity Union Trust Co., 108 N. J. Eq. 564; McAllister* v. *McAllister, 120 N. J. Eq. 407; affirmed, 121 N. J. Eq. 264; Gales* v. *Plainfield Trust Co., supra; In re Bender, 122 N. J. Eq. 192; affirmed, 123 N. J. Eq. 171; In re Westhall, 125 N. J. Eq. 551*), unless by their subsequent actions or conduct they can be said to have concurred or acquiesced in the investments.

It matters not that those Trust Co. directors who were officers and directors of the Mortgage Co. did not vote at the board meeting at which investment of the trust funds was considered and authorized. They were present at the meeting and it was their duty, as it was the duty of every member of the board, to find a proper and advantageous investment of the funds entrusted to their care and they could not

shirk that duty or acquire any advantage to themselves by declining to vote. *Stewart* v. *Lehigh Valley Railroad Co., supra; Tooker* v. *National Sugar Refining Co., 80 N. J. Eq. 305; Purchase* v. *Atlantic Safe Deposit and Trust Co., 81 N. J. Eq. 344; affirmed, 83 N. J. Eq. 353*. It cannot be ascertained what amount of influence any particular director exerts in favor of any matter in which he has an interest coming before his board. Although not voting, he may by argument or discussion induce votes from his fellow members, as well as by friendship, association or confidence, or by knowledge that although he refrains from voting, he desires favorable action by others.

Almost immediately after her husband's death, the complainant, Esther Rothenberg, retained Mr. Mindes, the solicitor who filed the bill herein, as her attorney to represent her interest in the trust, and he and she had several conferences with Trust Co. officers who informed them of investment of the trust fund in mortgages, and in September, 1932, the Trust Co., replying to a request from Mrs. Rothenberg, sent her a list of the mortgages, stating the amount of each mortgage and the location of each mortgaged property, which list, however, did not show that the mortgages had been purchased from the Mortgage Co. If Mr. Mindes had not been informed at or prior to that time (I think he had) that the mortgages had been purchased from the Mortgage Co., he certainly ascertained that fact, at least as to Essex county mortgages in the fall of 1933, from an examination personally made of the records in the office of the register of that county and he knew there was some affiliation between the Trust Co. and the Mortgage Co. through their officers and directors. He testified he ceased to represent Mrs. Rothenberg in the fall of 1933, wherein appears a strange lapse of memory for it is certain he represented her in 1934 and 1935 in which years he knew that the Trust Co. continued to hold some Mortgage Co. mortgages.

August 14th, 1934, Mr. Mindes, as solicitor, filed a petition in this court in the name of Jerome Rothenberg by Esther Rothenberg, his next friend, praying that the Trust Co. be ordered to pay $8,000 of the trust funds toward the

support, maintenance and education of the minor, and that all persons interested in the trust estate show cause why the petition should not be granted, on which petition a further order was entered, directing all persons I have called complainants herein, to show cause why the petition should not be granted. On a petition presented by Mr. Mindes as solicitor for Mrs. Rothenberg, an order was entered appointing a guardian *ad litem* for the infant *cestui,* Samuel Rothenberg, Jr., pursuant to which appointment that guardian *ad litem* proceeded to take testimony concerning the allegations of the petition, which testimony is on file in the proceedings and discloses that Mrs. Rothenberg and Jerome Rothenberg (then eighteen years of age) among others, testified on August 20th, 1934, in an examination conducted by Mr. Mindes and by the guardian. The testimony then given by an assistant trust officer of the Trust Co. states definitely that a part of the trust fund to the extent of $249,810.53 was then invested in guaranteed mortgages of the Mortgage Co., of which several were then in arrear as to principal and interest.

On July 30th, 1935, the Trust Co.'s first account was filed in this court with Vice-Chancellor Stein, which report stated under a summary of the estate's assets, that the Trust Co. then held "Guaranteed mortgages of Franklin Mortgage & Title Guaranty Co., $219,919.35." It also gives an itemized list of the names of each mortgagor and under the heading, "Nature of disbursements, purchase guaranteed mortgage" states the amount of each mortgage purchased by the Trust Co. in June, July and August, 1932; it also gives a long itemized list of "interest on guaranteed mortgages" (naming the mortgagor in each instance) of interest payments received by the Trust Co. between July 1st, 1932, and May 23d, 1935. On this account an order was entered directing all the complainants to show cause why the account should not be approved and allowed, and appointing a guardian *ad litem* for the infants Jerome and Samuel. Proof of service of the order on all complainants by mail was filed and the guardian *ad litem* acknowledged personal service of a copy of the account and of the order to show cause. On the return day of the order to show cause an order was advised by said Vice-

Chancellor, "No cause appearing to the contrary," allowing and approving the account, which order recites the appearance of Mr. Mindes as solicitor for Mrs. Rothenberg and the appearance of the guardian *ad litem* of the infants. While the account and the order allowing it may not be conclusive on all the parties as to all items of receipts and disbursements, the filing of the account and the order to show cause were notice to all complainants of the statements therein contained and especially of the statement that the trust estate had been invested in mortgages purchased from and guaranteed by the Mortgage Co.

The mortgages were not purchased in violation of the trust agreement or of any statutory law. The only vice I can find is that they were purchased from an affiliated corporation; had they been purchased from another mortgage company they would have been proper investments for the trust. There was no concealment by the Trust Co. of the manner in which the investments were made and the *cesluis que trust*, by reasonable diligence in making inquiry of the Trust Co., could have ascertained all the facts. I think the proofs support the conclusion that the complainants knew or had notice of the fact that the mortgages were purchased from the Mortgage Co. and acquiesced therein for five years and until they thought the investments had depreciated in value, and having concurred or acquiesced in the investments soon after they were made, or having had knowledge either actual or constructive of the facts, they failed to promptly disavow the investments and cannot now complain. *Ross* v. *Savings Investment and Trust Co., 120 N. J. Eq. 87; affirmed, 123 N. J. Eq. 288.* In dealing with the adult complainants herein I have no doubt that they are estopped from complaining. Besides the knowledge and information Mrs. Rothenberg obtained in person from the Trust Co. officials, and at the hearing before the guardian *ad litem* on her application as next friend for her son Jerome for allowance for his maintenance and education, she had definite knowledge through her solicitor who was fully informed of the situation. The three individual defendants (whom for convenience I have called complainants) also had actual or constructive notice

of the facts and in any event their contingent interest is so remote that it is improbable they will ever receive any benefit from the trust and their claim to surcharge the Trust Co. should not be considered unless and until it appears they are hurt.

It is urged that there can be no estoppel as to the infant complainants, but the Trust Co. has rights as against them which are entitled to consideration and protection. Jerome Rothenberg is now of age but Samuel is about fifteen. Were they and those who stand in close relation to them, entitled to remain absolutely quiescent after having knowledge of what they now assert to have been the legal rights of the infants? If this proceeding had not been instituted, would the infant Samuel still have six years within which a claim for immunity for responsibility to act would be allowed him? If so, the Trust Co. could not have its own rights established for a long period of time yet to come, with the possibility of inequity resulting to it. It has been held that infants' rights are not superior to those of adults, only that the court must see that the opportunity to assert such rights is afforded to them. *In re Shreve, 87 N. J. Eq. 7; affirmed, ibid. 710; Bunting v. Bunting, 87 N. J. Eq. 20; Graves v. Graves, 94 N. J. Eq. 268; Morris v. Glaser, 106 N. J. Eq. 585; affirmed, 110 N. J. Eq. 661; Reuther v. Fidelity Union Trust Co., 116 N. J. Eq. 81.* If the Trust Co. was wrong in making the investments in question, it was the duty of those who knew the infants might suffer from such wrong, to assert the infants' rights immediately. The mother of the two infants is chargeable with knowledge of the investments very soon after they were made. In the proceedings she instituted in 1934 through Mr. Mindes, for support and maintenance of her son Jerome, she and Mr. Mindes received definite information concerning the investments. In those proceedings she represented Jerome as his natural guardian and her son Samuel was represented by a guardian *ad litem*. In the Trust Co. accounting in 1935 definite disclosure, with more particularity, was made of the same investments and Mr. Mindes then appeared for Mrs. Rothenberg and a guardian *ad litem* was named for both infants, and it can be said that

the order allowing the account was an approval of the investments therein shown to have been made, binding on the infants. Having thus been informed of the nature of the investments, it was the duty of Mrs. Rothenberg and her solicitor to proceed at once on behalf of the infants to question the investments, and having failed to do so I think it would be inequitable to hold that the infants are not under the same estoppel as applies to the adult complainants.

Had I reached the conclusion on the facts and circumstances herein recited, that the Trust Co. should be surcharged for such part of the trust as is now represented by its mortgage investments and the real estate acquired under some of those mortgages, I would not be willing to remove the Trust Co. as trustee because such legal error of which it was guilty was not committed in bad faith, or through lack of honesty or due diligence, and I have no apprehension that the assets of the estate will be in danger through its continuation in office. *Heisler* v. *Sharp's Ex'rs, 44 N. J. Eq. 167; affirmed, 45 N. J. Eq. 367; McAllister* v. *McAllister, supra.*