In March, 1939, George E. Meagher, one of the defendants herein, a professional promoter and operator of cemeteries, conceived the plan of establishing a cemetery in Paramus, Bergen County, New Jersey. In connection therewith he caused his counsel, Messrs. Heine Heine, to organize a land company under the general corporation law of this state, known as the Memorial Development Company, which is also a defendant herein. The incorporators of the company were Meagher's attorney, Norman Heine, and two employees in his office, Lillian Lipkin and Hilda Schwartz. The Development Company had two classes of stock, 10,000 shares of common, with voting power, having a par value of one mill per share, and 1,000 shares of preferred, having a par value of $100 per share. Each incorporator subscribed to 35 shares of preferred stock and five shares of common stock.
At the first meeting of the incorporators on March 20th, 1939, Heine assigned his stock subscription to Meagher; Lillian Lipkin assigned her subscription to Meagher's daughter, C. Mima Harper; and Hilda Schwartz assigned her subscription to Walter S. Wright, Jr. The assignees were thereupon elected directors. They held a meeting at which Meagher was elected president, Wright vice-president, and C. Mima Harper secretary and treasurer.
Thereafter, Meagher succeeded in selling 140 shares of preferred stock and 140 shares of common stock in the Development Company to one Walter Bass, who paid therefor $13,839.80. The Development Company had no moneys other than that which it received from the sale of the stock.
Meagher then undertook to find a location for a cemetery and decided upon two tracts of land located within the Borough of Paramus, Bergen County, one known as the Brewster *Page 282 
tract and the other called the Oakland tract. He procured options to purchase them from the owners.
He then met and interested Frank De Geeter in his enterprises. From that meeting a written agreement (C-11) resulted sometime in August, 1939, whereby De Geeter agreed to advance $60,000 and Meagher to contribute the professional skill necessary to operate the cemetery. The common stock division in the Development Company was agreed upon: De Geeter was to get 51% and Meagher and others the balance. The agreement further provided that the De Geeter and Meagher interests should be equal with respect to the management and direction of both enterprises, the Development Company and the Cemetery Association, including the matter of salaries; and that Meagher should at all times have the right to name one director of the Development Company and one trustee of the Cemetery Association. It also appears that De Geeter received 600 shares of the preferred stock of the Development Company. In order to accomplish the stock distribution agreed upon by Meagher and De Geeter, it was necessary to get back the stock that had been previously sold to Bass. Meagher succeeded in doing this. Bass received in return for his stock a number of lots in the cemetery. Other provisions of the agreement need not be recited here — however, on the whole, it appears to be essentially a joint enterprise on the part of De Geeter and Meagher to operate, through the medium of the Development Company, a cemetery association for profit in a manner contrary to law.
In July, 1939, Meagher formed the complainant corporation, The George Washington Memorial Park Cemetery Association, under the Rural Cemetery Act, R.S. 8:1-1 et seq. He selected its first board of trustees, seven in number. On this board were men who were interested in the Oakland Realty Company, which negotiated the sale of the Oakland tract to De Geeter, who, in turn, conveyed it to the Development Company.
When De Geeter agreed to advance the necessary moneys for Meagher's projects, Meagher procured the resignations of all of the trustees of the Cemetery Association, excepting Albert R. Winans, who was permitted to remain on the board *Page 283 
to look after Meagher's interests. The vacancies caused by the resignations of the others were filled by De Geeter and his nominees. This took place on or about August 18th, 1939, and resulted in De Geeter and Meagher having complete control of the cemetery.
On August 29th, 1939, the Borough of Paramus issued the cemetery permit for which De Geeter paid $45,000 by bank checks from his personal funds. That sum represented the balance due for the permit fee, $5,000 having been previously paid by Meagher by check of the Memorial Development Company.
Two days before the permit was issued, Meagher procured the resignation of two of the three dummies who constituted the board of directors of the Development Company. They were replaced by Frank De Geeter and his brother Julius. The directors then consisted of George Meagher and the two De Geeters. Meagher was named president; Frank De Geeter, treasurer and secretary, and Julius De Geeter, vice-president. All of the issued and outstanding preferred stock of the Development Company, 600 shares, went to Frank De Geeter, and the common stock was divided so that Frank De Geeter had approximately 51% and Meagher 49%. Meagher subdivided his stockholdings and gave 500 shares to Winans, who was a trustee of the Cemetery Association, and some shares to Wright, who had been a director of the Development Company.
On September 27th, 1939, the Cemetery Association and the Development Company entered into an agreement. That contract (C-2) was signed by Meagher and De Geeter for the respective corporations involved. It recited that the Development Company, by deed of even date, had conveyed to the Cemetery Association 98 acres of land, to constitute the cemetery. As a matter of fact conveyances were not made until a later date as will hereinafter appear. Under the terms of said agreement the Cemetery Association agreed to pay the Development Company, as the purchase price, 50% of all moneys received from the sale of all lots and plots in the property conveyed. The other 50% was to be applied as follows: 10% of the moneys realized from the sale of lots *Page 284 
was to be set aside for a perpetual care fund, and the remaining 40% was supposed to be used for the purpose of employing a superintendent, managers, office and other help, the payment of commissions of all kinds, sales, advertising, c. I saysupposed because of what eventually transpired.
Both Meagher and De Geeter took care of that 40% by another agreement — a draft of which is annexed to C-11. They agreed to have the Cemetery Association enter into an exclusive sales contract with Meagher's son, George E. Meagher, Jr., or his assignees or nominees, which contract was to call for a commission of 40% of the sales price of all lots or plots sold thereunder. Such an agreement was in fact executed between the Cemetery Association and the George E. Meagher, Jr., Management Company, the assignee or nominee of George E. Meagher, Jr.
The Cemetery Association was without funds. After the contract with the Management Company had been signed, an extensive campaign for the sale of cemetery lots took place which resulted in the payment of approximately $250,000 in commissions to Meagher or his Management Company. De Geeter participated in these commissions to the extent of 2 1/2% of all moneys collected.
The nominal head of the Management Company was, as stated, Meagher's son, a young man twenty-one years old, with little or no business experience. It was practically admitted that Meagher, Sr., was in fact the Management Company. In a proceeding before the Securities Exchange Commission, Meagher, Sr., so testified. The SEC criticized the sales methods employed by the Management Company, and this resulted in a consent decree which enjoined the practices employed by the company.
Thus, for every dollar that was received under this plan of operation, 50% was to go to the Development Company; 10% was to be set aside to create a perpetual care fund; and 40% went to Meagher under the exclusive sales agreement. How the parties ever expected a cemetery to result under such an arrangement is beyond my comprehension.
C-2 is definitely a void contract — and this is practically admitted by Meagher's counsel. *Page 285 
Passing this for a moment, we find that the Brewster tract, which consisted of approximately 82 acres, was actually conveyed by the owners thereof to the Memorial Development Company on September 29th, 1939. It appears that the owner of the tract, George M. Brewster Son, Inc., would not convey the property to the Development Company unless Julius De Geeter, Sr., the father of Frank, went on the mortgage bond. This was done, Julius De Geeter, Sr., signing the bond which accompanied the $45,000 mortgage.
On October 4th, 1939, a deed was executed by the Oakland Realty Company to Frank De Geeter for 102 acres covering another portion of the land which was to make up the cemetery. For this deed Frank De Geeter paid $15,000 from his own funds and gave back a purchase-money mortgage for $20,000. On the same day that he received title to the property he conveyed it to the Development Company, which now held title to both the Brewster and Oakland tracts.
On October 27th, 1939, the Development Company conveyed to the Cemetery Association 98 acres of land out of the Brewster and Oakland tracts. These 98 acres constituted the cemetery. Under the terms of this conveyance, the Cemetery Association assumed and agreed to pay the mortgages on the entire acreage which had been conveyed to the Development Company, which mortgages totaled $65,000 — notwithstanding the fact that only 98 acres, out of 184 acres, were conveyed to the Cemetery Association. In this transaction no money passed from the grantee to the grantor.
On the same day this conveyance was made, a special meeting of the trustees of the Cemetery Association was held and resulted in Frank De Geeter being elected its president; Julius De Geeter, vice-president; and Melvin McLean, secretary. At said meeting resolutions were passed authorizing the Cemetery Association to purchase the aforesaid 98 acres of land; to establish a perpetual care fund; and to execute a guaranty to Frank De Geeter and his father because of the obligations they had assumed in connection with the mortgages covering the Brewster and Oakland tracts.
The cemetery business was conducted under the arrangement which provided for the disposition of 90% of the sales *Page 286 
price of all lots into the hands of the promoters, and 10% for the establishment of a perpetual care fund, until the end of 1941, or the early part of 1942, when, on the advice of its then counsel that such an arrangement was illegal and contrary to the public policy of this state, a change was made.
The change was effected by the execution of an agreement (C-7), in or about the month of April, 1942. It was dated "as of October 27th, 1939," and attempted to cure the patent defects of the September 27th, 1939 (C-2) agreement. It provided that the Development Company would convey to the Cemetery Association 98 acres of land suitable for development as a cemetery (this had already in fact been done); that in consideration of the conveyance to it of the 98 acre tract, the Cemetery Association would convey to the Development Company 35,136 cemetery lots and plots (this constituted the entire 98 acre tract and was equivalent to the 34 blocks mentioned in the agreement); that the Cemetery Association should have the right to exercise three options covering 12 blocks of cemetery lots for a stated consideration (it appearing that graves in said 12 blocks had already been sold to the public and interments made therein); and that the Development Company would not offer any of said cemetery lots or plots for sale without first offering them to the Cemetery Association at a price per plot not to exceed 50% above the average selling price per plot established by the most recent sale by the Development Company to the Cemetery Association, with the proviso that the Development Company should have complete discretion as to the number of cemetery lots and plots to be included in a single offering to the Cemetery Association, and with the further proviso that any cemetery lots or plots so offered by the Development Company to the Cemetery Association and not accepted and paid for by the Cemetery Association within two weeks from the date of the offer should be released from all further sales restriction.
This agreement put the Cemetery Association completely at the mercy of the Development Company. It was the sole arbiter of the number of lots or plots to be offered the Cemetery Association. It could, if it so wished, make no offering at all. The price formula fixed in the agreement cannot be *Page 287 
sustained. Let us assume that the Cemetery Association desired to purchase some lots under this agreement. The Development Company, in its discretion, could offer it any number it pleased. Let us say it offered five lots at $30 per lot. If the Cemetery Association needed more at a subsequent date the price, under the formula, would be $45 per lot; the next offering would increase the price to $67.50 per lot, and so on until the figures would reach astronomical proportions depending on the Cemetery Association's needs and the number of lots offered for sale at any one time by the Development Company.
Pursuant to this agreement (C-7), the Cemetery Association, by a form of cemetery deed, conveyed the right of sepulchre in the entire 98 acre tract to the Development Company, and, except for the 12 blocks which were embraced in the options contained in the agreement, the Development Company to-day controls the remaining 22 blocks of cemetery lots and seeks to subject them to the provisions of C-7.
The evidence produced at the hearing, which was participated in by the Attorney-General, through his deputy, demonstrated to my satisfaction the invalidity of agreements C-2 and C-7. The issue was clearly defined, being limited on this phase of the case to the validity or invalidity of the agreements. All counsel vigorously and ably presented the views of their respective clients and the briefs submitted have been very helpful to the court.
However, the agreements, by their very terms, and the proofs produced, leave no doubt in my mind that the agreements in question cannot be sustained. They are contrary to the public policy of this state. R.S. 8:2-11 provides that at least one-half of the proceeds of all sales of plots or lots in the cemetery shall be first appropriated to the payment of the purchase-money of the lands acquired by the cemetery until the whole thereof is paid, and that the balance is to be used for the preservation, improvement and embellishment of the cemetery. Both agreements, in my opinion, clearly violate the statute.
Schemes to circumvent the statute have been struck down time and again by our courts. In the case of East Ridgelawn *Page 288 Cemetery Co. v. Frank, 77 N.J. Eq. 36; 75 Atl. Rep. 1006, a plan somewhat similar to that here involved was denounced. The court said:
"By the scheme under review no purchase price is fixed. The certificate holder receives either the whole or a part of the proceeds of the sale of the burial lots up to the time that the last lot is sold. He thus gets the benefit of the sums expended for improvement and embellishment, whether those sums be derived from donations or from the proceeds of the sales of lots. He makes a profit out of their exemption from taxation and levy, and even from the possible exercise of the power of eminent domain. The statute contemplates the purchase of the land for a definite price; but under the scheme in question there is no price, in the ordinary sense. The grantor either appropriates the whole of the proceeds of the sale of the lots `after deducting certain charges and expenses;' or at least a part, and if a part, we are not told how much."
In Atlas Fence Co. v. West Ridgelawn Cemetery, 119 N.J. Eq. 552; 182 Atl. Rep. 902, the court upheld the principles laid down in East Ridgelawn Cemetery Co. v. Frank, supra. And in the case of Passaic National Bank and Trust Co. v. EastRidgelawn Cemetery Co., 137 N.J. Eq. 603; 45 Atl. Rep. 2d814, our Court of Errors and Appeals in considering a provision in a declaration of trust permitting profits to be realized from the sale of cemetery lots, said:
"The challenged provision for a dividend fund contravenes the essential policy of the statute and is therefore void. EastRidgelawn Cemetery v. Frank, 77 N.J. Eq. 36; 75 Atl. Rep. 1006;Atlas Fence Co. v. West Ridgelawn Cemetery Co., 119 N.J. Eq. 552; 182 Atl. Rep. 902. It is alien to the legislative scheme, and public policy forbids its enforcement."
In Burke v. Gunther, 128 N.J. Eq. 565; 17 Atl. Rep. 2d481; affirmed, 133 N.J. Eq. 609; 33 Atl. Rep. 2d 817, a similar scheme was denounced. In this last case, the court among other things said:
"The statute itself precludes anyone from making a profit in the operation of the cemetery. The moneys collected by a cemetery company, such as this, consist almost exclusively of the proceeds of the sale of lots and plots. Such moneys *Page 289 
are by statute to be applied to only two purposes: (a) the payment of the purchase-money of the lands acquired by the cemetery; and (b) the preservation, improvement and embellishment of the cemetery grounds and the avenues and roads and the incidental expenses of the cemetery establishment. At least one-half of the proceeds of such sales of plots or lots is to be first appropriated to the payment of such purchase-money of the lands acquired. 1 Comp. Stat. p. 375 ¶ 10, now R.S.8:2-11."
The same rule was laid down in the case of City of Clifton v.State Board of Tax Appeals, 133 N.J. Law 379; 44 Atl. Rep.
2d 102.
Unquestionably the agreements C-2 and C-7 come clearly within the condemnation of our cases. It is to be noted that if the agreement C-7 were executed in 1942, it could not have been made effective as of October, 1939, since the first agreementC-2, which it undertook to replace, was illegal and void. The substitution could be no stronger. Title to the land was already in the Cemetery Association. The agreement C-7 purported to convey to the Cemetery Association lands which it already owned. In other words, there was no agreement at all. As to part of the cemetery lands, the right of sepulchre had previously been sold to the general public and bodies had been interred. Under that situation it would be difficult to understand how those lots could be conveyed to the Development Company — they could not be sold since they are forever inalienable under the provisions ofR.S. 8:2-21.
The alleged agreements furthermore are illegal and void for the reason that De Geeter and Meagher were directly and personally interested in them. They controlled both the Cemetery Association and the Development Company, and, as observed by counsel, that control was rigged for the purpose of carrying out the agreement known as C-11. The principle is well established in this state that directors of a corporation cannot lawfully enter into a contract, in the benefit of which even one of their number participates without the knowledge and consent of the stockholders. United States Steel Corp. v. Hodge, 64 N.J. Eq. 807; 54 Atl. Rep. 1. That is the rule respecting private corporations. In the instant case we *Page 290 
have a charitable trust, the care of which is the peculiar function of this court. Its trustees are subject to all the restrictions placed upon trustees including the prohibition against a private profit in the exercise of their trust.
The cases in this state supporting this principle are abundant, among which may be mentioned Gates v. Plainfield Trust Co.,121 N.J. Eq. 460; 191 Atl. Rep. 304; In re Bender, 122 N.J. Eq. 192; 192 Atl. Rep. 718; Rothenberg v. Franklin Washington TrustCo., 127 N.J. Eq. 406; 13 Atl. Rep. 2d 667; Masholie v.River Edge Estates, Inc., 129 N.J. Eq. 228; 19 Atl. Rep. 2d27.
An attempt was made to show that the agreement C-7 was ratified at a lot owners' meeting. This testimony came from Meagher, Jr., and Winans, who were naturally interested in the ratification of the agreement. In addition to the seven interested trustees, there were only two other people present at said meeting. No notice was given to the lot owners, numbering several thousand, that the agreement would be submitted for approval, and there was no disclosure that the trustees were personally interested in C-7. Since the Cemetery Association is a public or charitable trust, no action taken by the lot owners, or anyone else, could make that legal which was clearly illegal, and the alleged approval, if there was such, is of no weight or value in the circumstances. See General Investment Co. v.American Hide and Leather Co., 97 N.J. Eq. 214;127 Atl. Rep. 529, and Iback v. Elevator Supplies Co., Inc., 118 N.J. Eq. 90; 177 Atl. Rep. 458.
The law is clear that a trustee cannot make a profit out of a trust relationship, and cannot take a position antagonistic to his trust. When Frank De Geeter advanced $45,000 for the cemetery permit he was a trustee of the Cemetery Association. He, with his relatives and friends, dominated the board, and when he took an option in his own name to the Oakland tract, he took it from a trustee of the association with knowledge that he, Frank De Geeter, was going to subsequently become a trustee, and when he took the conveyance in his own name and paid the purchase price, he was in fact a trustee. He was acting on behalf of the Cemetery Association. The Cemetery Association had guaranteed him against *Page 291 
loss in the event that he had to pay the mortgage which he gave on the Oakland tract, and as additional security gave him a deed covering the Oakland tract. He secured the signature of his father to the Brewster bond. The Cemetery Association guaranteed his father against loss and gave the father a deed covering the Brewster tract as additional security. Frank De Geeter certainly could not be permitted to take a position antagonistic to his trust. See Taylor v. Errion, 137 N.J. Eq. 221; 44 Atl. Rep.
2d 356, which condemns a person from placing himself in a position which will tempt him to take advantage of his principal or cestui que trust. To the same effect is Camden Trust Co.
v. Cramer, 136 N.J. Eq. 261; 40 Atl. Rep. 2d 601, where the court emphasizes the principle that undivided loyalty to thecestui is the very essence of the relationship. Staats v.Bergen, 17 N.J. Eq. 554; Porter v. Woodruff, 36 N.J. Eq. 174.
Our courts in numerous cases hold to the principle that the contract of a trustee enures to the benefit of the principal.Von Hurter v. Spengeman, 17 N.J. Eq. 185; Seacoast RailroadCo. v. Wood, 65 N.J. Eq. 530; 56 Atl. Rep. 337; Schenck v.Davis, 134 N.J. Eq. 375; 35 Atl. Rep. 2d 681; Huber v.Liptak, 136 N.J. Eq. 515; 42 Atl. Rep. 2d 705.
So much for the relationship of trustee and cestui which existed between the De Geeter interests and the Cemetery Association.
The relationship of Meagher and De Geeter as promoters on the one hand and the Cemetery Association on the other was also established. A promoter is a fiduciary. See Bigelow v. OldDominion Copper Mining and Smelting Co., 74 N.J. Eq. 457;71 Atl. Rep. 153; Allenhurst Park Estates v. Smith, 101 N.J. Eq. 581;138 Atl. Rep. 709.
The Cemetery Association board and the Development Company board undoubtedly were interlocking boards of trustees and directors.
The assertion was made that De Geeter advanced moneys as a stockholder of the Development Company. There was no stock subscription. No corporate action appears to have been taken by the Development Company. C-11 supplies *Page 292 
the information that De Geeter was to advance the major part of the money to buy the lands and to secure the permit for the cemetery. Meagher's guarantee annexed to that document recites that he gives De Geeter additional security to induce him to advance the moneys to buy the land and to pay for the permit.
Meagher's position as a promoter unquestionably stamps him as occupying a fiduciary relationship. He was president and stockholder of the Development Company and placed Winans on the board of trustees of the Cemetery Association as his personal representative. The evidence indicates that Winans was dominated by Meagher.
It follows from my conclusion that agreements C-2 and C-7
are void, that title to the lands comprising the cemetery, including the right of sepulchre, should be decreed to be indefeasibly vested in the Cemetery Association. This leaves open the question of what should be paid for said lands by the Cemetery Association, and to whom.
The complainant holds itself ready to discharge its equitable obligation to pay to the Memorial Development Company, or to the promoters of the enterprise, whatever is rightfully due. Together with the lot owners, the Cemetery Association claims that its liability is limited to the return of moneys actually advanced on its behalf, and to pay for the reasonable value of service rendered for its benefit.
Counsel for Meagher take the position that notwithstanding the illegality of C-7 the court should nevertheless use the formula contained in that agreement to determine the price the Cemetery Association should pay for the lands. With this I am unable to agree. The agreement is void. The price formula therein contained, based on a sliding scale which calls for an increase in price each time the Cemetery Association applies for lots is not my idea of equity and does not extend to the charitable trust and its lot owners, present and future, the protection they are entitled to receive from this court.
Meagher's counsel take the further position that should the court reject the suggestion that the value of the cemetery lands be ascertained from the agreement between the parties, *Page 293 
then the court should fix the reasonable value of the lands; and also, should it be determined that the Memorial Development Company is not entitled to recover, then Meagher be compensated for his efforts in bringing the cemetery to fruition.
De Geeter's position is that he wishes to be reimbursed for the moneys he laid out in the cemetery enterprise and be compensated for the time and effort he expended in the project.
The Memorial Development Company takes the position that agreement C-7 is valid and that consequently the obligations imposed thereby should be sustained, with the alternate view that if said agreement should be declared to be invalid, the fair and reasonable value of the lands should be determined and paid to the Development Company.
A decree may be presented with respect to my determination that agreements C-2 and C-7 are invalid, and that title to the lands comprising the cemetery, including the right of sepulchre, is indefeasibly vested in the Cemetery Association, subject to a further determination as to what should be paid by complainant, and to whom. I will hear counsel on these open phases of the case.