The bill is to foreclose a mortgage on a cemetery. The Union Cemetery Association was incorporated November 5th, 1909, under the Rural Cemetery act, by Samuel E. Renner and six others, the seven being the first trustees. Renner was the promoter — the others had no material interest. Renner purchased a farm of one hundred and twenty acres in Union township, Union county, on the outskirts of Newark, bisected by Stuyvesant avenue, for $50,000, and procured a franchise to operate a cemetery on it. Thereupon Renner submitted a proposition to the trustees, he having first formally resigned from the board, to sell to the Cemetery Association the land, and to (a) cause the property to be surveyed and laid out in lots and plots for cemetery purposes; (b) hedge or fence the tract on either side of Stuyvesant avenue; (c) improve the tract on the east side of Stuyvesant avenue (forty-five acres) ready for sale and interment at a cost not to exceed $50,000; (d) construct a single-track trolley line on Stuyvesant avenue from the cemetery to connect with the Springfield avenue line of the Public Service Corporation, trap rock the roadbed, obtain the franchise therefor and a contract with the Public Service Corporation to operate it; (e) widen Stuyvesant avenue, and macadam it to the width of fifteen feet from Meeker Inn to the county line; (f) pay the legal expenses ofLong v. Union, 79 N.J. Law 70; (g) pay the expenses for the cemetery franchise; (h) deposit $10,000 to secure the township against loss of taxes; (i) lend the association $5,000 for operating expenses, and (j) pay the coupons for the first two years on the bonds about to be mentioned. For all this, the Cemetery Association to issue $1,000,000 in bonds, in denominations of $1,000 and $500, at six per cent., payable semi-annually, to run for twenty years, and to be in form satisfactory to the trustees and counsel; the coupons for interest for the first two years to be canceled upon payment of twenty-five per cent. of the face value; the bonds to be secured by mortgage on the cemetery land and franchise; $750,000 of the bonds to be delivered to Renner upon conveying the land, the balance when he performed his contract. The proposition was forthwith *Page 102 
accepted by the trustees; the conveyance was made, the bonds were issued and the mortgage was executed on May 2d 1910, under the seal of the Cemetery Association, signed by its president and treasurer. $500,000 of the bonds were delivered to Renner and he promptly passed them on to the public at large, at varying prices, averaging about twenty-five cents on the dollar; in one or more instances he realized as high as fifty per cent. When the second years' coupons were not paid the bondholders held a conference, October, 1912, and investigated and found that during the two and a half years that had elapsed Renner had laid out about eighteen acres of the land on the easterly side of Stuyvesant avenue as a cemetery, and only some of this into burial lots and plots, upon which he claimed to have spent $39,500. The rest of the improvements he was to make were untouched. He had deposited $10,000 to secure the township's taxes, and claimed to have spent $2,700 for incorporation and mortgagee trustee's expenses; $25,000 in the Long v. Union
litigation, $10,250 for the first year's interest on the bonds, and $50,000 for the purchase price of the land; total of $137,450. Though he had resigned as trustee, Renner carried on the cemetery, such as it was, to that time; there had been thirty interments and eleven burial plots had been sold. He was bankrupt, and he made the bondholders an offer that he be paid $125,000 more of the bonds for an assignment of his contract to a corporation to be formed by them to finish his work; the company to take the balance of the bonds, $375,000, for doing that. The offer was referred and renewed to the Cemetery Association's trustees, some of whom were bondholders, and they accepted the offer. The bondholders formed the Stuyvesant Development Company; Renner assigned his contract and got the bonds. The Stuyvesant Development Company took the balance — $175,000 — outright and the equity in the remaining $200,000. That the company took but an equity came about in this manner. The Cemetery Association was without funds to function, and besides, the November, 1912, coupons were about to fall due. So the bondholders recommended to the trustees that they, and they did, borrow $15,000 from a bank to meet the coupons, giving as security *Page 103 
the $200,000 worth of bonds. The Stuyvesant Development Company assumed the payment of the note, but defaulted, and eventually it was paid by Renner, and he took the bonds. Renner sold them to all takers for about ten cents on the dollar. The Stuyvesant Development Company, seemingly, took a care not to expressly bind itself to finish Renner's contract, and it did nothing, so far as appears, in that direction, but in November, 1912, entered into a contract with the Cemetery Association to purchase the cemetery on or before May 1st, 1931, at a scaling price per square foot, and, in the meantime, yearly, sufficient to provide a fund to pay the interest on the bonds, and the operating expenses of the cemetery, not exceeding $5,000. This selling agency scheme carried on, in a desultory manner, until August, 1915, when another agreement was substituted whereby the Cemetery Association was to convey the cemetery to the Stuyvesant Development Company, and the latter agreed to sell the lots and plots and pay for them as they were sold, at the same scale of prices. The provision as to minimum sales to produce a yearly fund was eliminated from this contract. The Cemetery Association conveyed the lands accordingly and the fee is now in the Stuyvesant Development Company of record. The Stuyvesant Development Company, by counter-claim, admits it holds the title for the Cemetery Association. What progress was made under the later arrangement has not as yet been disclosed, except that the cemetery now contains several thousand graves, and, if unmolested, bids fair to achieve its purpose. No interest has been paid on the bonds since the bondholders prevailed upon the trustees to raise the $15,000 on the note to pay the November 1st, 1912, coupons, nor has there been any demand made for it during the years of the cemetery's struggle for existence. Indeed, some of the later year trustees did not know until recently of the existence of the bonds. In 1926 a bondholders' committee sold to Greenberg and Augenblick $882,500 of the bonds for $227,188.99, and they directed the Fidelity-Union Trust Company to file this bill to foreclose the mortgage.
The mortgage was executed to the Fidelity-Union Trust Company as trustee, and is in the usual form of such instruments, *Page 104 
providing for the equality of security for the bondholders; a three months' default clause, exercisable by holders of two-thirds of the bonds outstanding, and a provision that the expenses and compensation of the mortgagee trustee shall be a first lien. It recites that "this mortgage includes the purchase-money for said land," and it is stipulated that the Cemetery Association "shall lay out and improve the mortgaged premises so as to fit and make possible the use of the same for the purpose of burial, interment or cemetery purposes, and offer and expose for sale said lands as burial or cemetery plots," and upon the payment of one-half of the proceeds of sale of a burial plot or lot to the trustee it would release the sold portion from the operation of the mortgage, provided such half shall equal fifty cents a square foot for the plot or lot. By the bond, in which it is recited that there were seven hundred and fifty bonds of $1,000 each and five hundred each of $500, the Union Cemetery Association, for value received, promised to pay to the registered owner the sum of the denomination on May 1st, 1930, at the office of the Fidelity Trust Company, and the interest, per the coupons; the bond to be redeemable at par after five years. It is also stipulated therein that it is one of a series of bonds aggregating $1,000,000, the payment of which is secured by the mortgage, and that "these bonds are subject to the provisions of the said first mortgage;" and also that the bonds shall pass by delivery unless registered in the name of the owner.
The bill is in the common form to recover $1,000,000, the full bond issue, with interest. The Union Cemetery Association answers setting up part failure of consideration, and that the bondholders are not bona fide holders, and hold subject to the equities.
The extra statutory features of a promoter sharing profitspari passu with a cemetery association, dealt with inRidgelawn Cemetery v. Frank, 77 N.J. Eq. 36, and Bliss v.Linden Cemetery Association, 83 N.J. Eq. 494, on appeal85 N.J. Eq. 501, are absent. Here, the compensation for the promoter's services, including profits, is fixed as part of the purchase price. Whether it is unconscionably high, and purposely *Page 105 
so, to circumvent the inhibition of the Cemetery act is, presently, of no moment, for the promoter failed in the performance of his contract, and, hence, did not earn the purchase price. The general scheme of the promoter may not have been inimical to the Cemetery act had it been carried out to a going and sustained cemetery, but the manner of promotion, the issuance of negotiable bonds for the consideration, was a gross fraud on the statute. However, the cemetery association kept the cemetery lands and must account for the reasonable value as of the time the promoter quit, plus promoter's compensation protanto and his outlay as above noted, excluding the purchase price paid by him for the farm, the expenditure for improvement and his payment of the first year's coupons; the latter was laid out for the promoter's benefit. If the Stuyvesant Development Company did anything towards the performance of the promoter's contract, the value may also be included in the purchase price. For the purchase price the promoter would be entitled to a vendor's lien, and there can be no valid objection that the lien finds expression in a mortgage, though no express authority to execute a mortgage may be found in the statute. The Cemetery act implies the power within limitations. Section 8 exempts from taxation bonds and mortgages given for the purchase price. InSpear v. Locust Wood Cemetery Co., 72 N.J. Eq. 821, there was a decree of foreclosure of such a mortgage. The question raised and decided in that case was the manner in which the decree should be executed. It is true that Mr. Justice Garrison, inBliss v. Linden Cemetery Association, supra, said that the cemetery there involved could not secure to the vendor the purchase price, but his remarks related to the association's financial inability, not to its power.
The contention that bonds to the extent of $625,000, given to Renner, are beyond attack, because, to that extent the cemetery association adjusted its differences with him, may be dismissed with the comment that the vote of Renner's dummy trustees to hand over to him in advance three-quarters of a million dollars of bonds was vicious, and that the vote of the later board of trustees, said to be independent, to give *Page 106 
him $125,000 of the bonds in settlement of his claim, when he, in fact, was in default, simply compounded the mischief to enable themselves, or those whom they served, to acquire the remaining bonds and was no less iniquitous. The cemetery association cannot be bound by any such self-serving prodigality.
The complainant as trustee for the bondholders claims, however, that they are not bound by the equities; that the bonds are negotiable, and that they are bona fide holders for value without notice. It relies on Dennis v. Glenwood Cemetery,96 N.J. Eq. 399, where Vice-Chancellor Foster, in a case to enforce a vendor's lien, and the collection of bonds given to promoters of a cemetery for the purchase price, including profits, held only, that the bonds were negotiable in form, consistent with the Negotiable Instrument act definition, not that they were in law negotiable. That question was not involved, for he had previously held that the bonds were valid obligations in the hands of the first takers, and consequently enforceable by the assignee. The court of errors and appeals approved his conclusion as to the manner in which a perpetual care fund was to be established and how the bondholders were to be paid. That case is not helpful to a decision. It may be that the cemetery association is responsible to bona fide holders for its negotiable paper, issued without consideration, but it does not concern us in this foreclosure suit; that question can be settled only on an issue raised by or against the holders, as in the Bliss and DennisCases. The question for decision, and the point decided is, that the defendant cemetery association had not corporate power to pledge its lands other than for the payment of the purchase price, i.e., to the extent of the vendor's lien contemplated by the statute; the lien of the mortgage to derogate to one-half the proceeds of sale of burial lots and plots as the lands are from time to time laid out for cemetery purposes. Beyond this, to secure negotiable bonds, for which it may be personally bound because negotiable and in the hands of innocent holders, the mortgage is ultra vires and void. It is not intended to indicate that a cemetery association cannot mortgage its lands to raise funds to promote the *Page 107 
enterprise, and to issue negotiable instruments in acknowledgment of the debt, nor to issue a mortgage to secure an existing debt, and to give negotiable paper as evidence, but at most, the capacity, implied by the statute, to mortgage property, as security, is limited to value received for cemetery purposes. The mortgage under foreclosure is valid only to the extent of the consideration that actually passed to the association and there will be a reference to a master to ascertain the amount, and also to report what land, unused for cemetery purposes, should be sold to satisfy the decree.