A decree heretofore entered in this cause on February 17th, 1947, carried out the court's determination that two agreements entered into between the complainant, George Washington Memorial Park Cemetery Association, and the defendant *Page 49 
Memorial Development Company, marked in evidence as ExhibitsC-2 and C-7, were illegal and void and contrary to the public policy of this state, and that title to certain lands comprising the cemetery involved in this suit, including the right of sepulchre, was indefeasibly vested in the complainant. The court's opinion is reported in 139 N.J. Eq. 280; 51 Atl. Rep.
2d 221.
The decree left open for future determination the question of complainant's liability for the cemetery lands it had acquired.
The complainant's bill in this case, directed primarily against the Development Company, was filed on January 21st, 1946. Thereafter, applications to intervene were made by George E. Meagher and Frank DeGeeter, who were the promoters of the interprise. Their applications were granted and both filed counter-claims herein. Leave to intervene was also granted to a committee of lot owners of the cemetery. The Attorney-General also appeared in the suit and participated actively in the hearing of the cause.
An effort was also made by Realty Affairs, Inc., a New Jersey corporation, and Walter S. Wright, Jr., stockholders of Memorial Development Company, to intervene in the litigation. Their application was denied, the reasons therefor appearing in the court's opinion reported in 139 N.J. Eq. 219: 50 Atl. Rep.
2d 837; affirmed, 140 N.J. Eq. 181; 53 Atl. Rep. 2d182.
The complainant recognizes its obligation to pay to the Memorial Development Company, or to the promoters of the enterprise, whatever is rightfully due. It says, however, that its liability is limited to a return of the money actually advanced on its behalf, plus such sum as will compensate the person or persons entitled thereto for the reasonable value of services rendered for its benefit. The lot owners join in this position.
The Memorial Development Company's contention is that since the agreement, C-7, has been declared illegal, it should be paid for the cemetery lands, valued as such, as of October 27th, 1939, the date of the conveyance from the Development Company to the Cemetery Association. *Page 50 
George E. Meagher also asserts that the award should go to the Development Company; the lands to be valued as cemetery lands as of January, 1946, when the bill of complaint in this cause was filed, or, in the alternative, as of October 27th, 1939, the date of the conveyance. Should the court reject this contention, Meagher maintains that he should be allowed on his counter-claim such sum as will compensate him for services rendered to the Cemetery Association, plus reimbursement for moneys advanced, together with a profit for the risk incurred.
Frank DeGeeter's stand differs from that of his co-promoter, Meagher. He says the award should not go to the Development Company. He seeks, by his counter-claim, to be reimbursed for the moneys he advanced in furtherance of the cemetery enterprise and to be compensated for the time and effort he expended in the project.
The Attorney-General joins in the position taken by the complainant and the lot owners and submits that the evidence justifies a dismissal of Meagher's counter-claim and an award on the counter-claim of DeGeeter.
The defendant Meagher, a resident of Philadelphia, is a professional promoter and operator of cemeteries. He conceived a plan for the establishment of a memorial park in the metropolitan area. He negotiated for options on two tracts of land in the Borough of Paramus, New Jersey. One tract, known as the Oakland tract, contained approximately 102 acres; the other, known as the Brewster tract, contained a little more than 82 acres. His associates in the venture at this time were his daughter, C. Minna Harper; Walter S. Wright, Jr., a salesman who had formerly been in his employ; and Albert R. Winans, president of Realty Affairs, Inc.
In furtherance of his plan, Meagher, in March, 1939, caused to be formed under our General Corporation Law the defendant Memorial Development Company. The authorized capital stock of the company was 10,000 shares of common, with voting power, having a par value of one mill per share, and 1,000 shares of preferred, having a par value of $100 per share. *Page 51 
The incorporators each subscribed to 35 shares of preferred stock and five shares of common stock. At the organization meeting held on March 20th, 1939, these subscriptions were assigned to Meagher; his daughter, Mrs. Harper; and Wright, who thereupon were elected directors of the company. A meeting of the board resulted in Meagher being named president; Wright, vice-president, and Mrs. Harper, secretary and treasurer.
Thereafter Meagher, with Wright's help, succeeded in selling 140 shares of preferred stock and a like number of shares of common stock in the Development Company to one Walter Bass for approximately $14,000.
With this money Meagher paid $1,000 to keep the Brewster option alive; $5,000 on account of the purchase price of that tract; and $5,000 to the Borough of Paramus in connection with an application for a cemetery permit. He also reimbursed himself for the taxes he had paid on the Oakland tract and for other moneys he had laid out. The balance was used to pay legal fees for the formation of a cemetery association and other incidental expenses.
When application for a cemetery permit was made, there was not yet any cemetery in existence. Meagher testified that the application for a permit had been made on behalf of himself, Mrs. Harper, Wright, and Winans, his associates, and a company which was then in process of formation.
In the latter part of July, 1939, Meagher caused to be formed under R.S. 8:1-1 et seq. the complainant corporation, The George Washington Memorial Park Cemetery Association. He selected its first board of trustees. On this board were men who were interested in the Oakland Realty Company, the owner of the Oakland tract, which was to form a part of the cemetery, and Winans, who was continued in office as a trustee notwithstanding the changes that subsequently took place.
Money was needed to take up the options on the Brewster and Oakland tracts and to pay for the cemetery permit if one should issue.
On or about August 1st, 1939, Meagher met Frank DeGeeter, who had some money but no experience in the cemetery *Page 52 
business. Meagher represented himself as a cemetery expert and interested DeGeeter in a proposal which resulted in a written agreement between them (Exhibit C-11).
Under its terms DeGeeter agreed to advance as a capital investment to the enterprise the sum of $60,000. Meagher agreed to secure the resignation of all of the then trustees, officers and directors of the Cemetery Association and the Development Company with the exception of himself. He also agreed to devote a reasonable amount of his time to the services of both corporations. They decided upon a division of the common stock of the Development Company whereby DeGeeter was to get 51% and Meagher and others, including Realty Affairs, Inc., the balance. Notwithstanding this division of the stock, it was agreed that the DeGeeter and Meagher interests should be equal with respect to the management and direction of both the Development Company and the Cemetery Association, including the matter of salaries; and that Meagher should at all times have the right to name one of the directors of the Development Company and one of the trustees for the Cemetery Association. They also agreed to cause the Cemetery Association to enter into an exclusive sales contract with George E. Meagher, Jr. (the son of promoter Meagher, and hereinafter referred to as Meagher, Jr.), or his assigns or nominees, under the terms of which the sales agency was to receive 40% of the sales price of all plots sold thereunder.
When DeGeeter agreed to advance the necessary money, Meagher procured the resignations of all of the trustees of the Cemetery Association, excepting Albert R. Winans, who was permitted to remain on the board to look after Meagher's interests. The vacancies caused by the resignations of the others were filled by DeGeeter and his nominees. This was done on August 18th, 1939, and resulted in DeGeeter and Meagher having complete control of the Cemetery Association.
On or about August 27th, 1939, a change also took place in the Development Company set up. Meagher procured the resignations of two of the directors of that company, and their places were filled by DeGeeter and his brother Julius. The directors then consisted of the two DeGeeters and Meagher. *Page 53 
Meagher continued as president and Frank DeGeeter was elected treasurer and secretary, and Julius DeGeeter, vice-president. All of the issued and outstanding preferred stock of the Development Company, 600 shares, went to Frank DeGeeter, and the common stock was divided so that Frank DeGeeter and his nominees received 51% and Meagher 49%. Meagher subdivided his holdings and gave some shares to Winans, and to Wright, who had been a director of the Development Company.
In order to accomplish this stock division it was necessary to effect a return of the stock formerly sold to Bass. Meagher succeeded in having Bass surrender his stock, who, in return therefor, received a number of lots in the cemetery to be formed.
Thereafter, on August 29th, 1939, the Borough of Paramus issued its permit to the Cemetery Association. It covered 98 acres of land. DeGeeter paid $45,000 for the permit out of his personal funds. That sum represented the balance due for the permit fee, $5,000 having been previously paid to the borough by Meagher by check of the Development Company.
Armed with the permit, there now remained the matter of acquiring title to the Oakland and Brewster tracts and setting up a scheme of operation.
The next step taken was the execution on September 27th, 1939, of the exclusive sales contract between the Cemetery Association and the George E. Meagher, Jr., Management Company (hereinafter called the Management Company), a corporation not then in existence. The contract provided that the Management Company was to receive 40% of the total sales price of each and every lot sold in the cemetery either by the Management Company or the Cemetery Association; that DeGeeter, as an employee of the Management Company, was to receive 2 1/2% of the total sales price of all lots sold; that in addition thereto the Management Company was also to receive a so-called overwriting commission of 37 1/2% and Frank DeGeeter a similar commission of 2 1/2% on all donations, contributions and bequests that the Management Company was instrumental in acquiring for the erection of chapels, memorials, or any other purpose. *Page 54 
Performance of the Management Company contract was guaranteed by the defendant Meagher. This instrument also recited that Meagher, in order to induce DeGeeter to advance the $60,000 toward the purchase of the lands and the acquisition of the cemetery permit, agreed to assign to DeGeeter as collateral security, certain moneys due Meagher on open accounts with the Whitemarsh Memorial Park Cemeteries Company of Philadelphia.
Both the sales contract and Meagher's guaranty to DeGeeter were annexed to Exhibit C-11. In my earlier opinion I took occasion to remark that the entire scheme was essentially a joint enterprise on the part of DeGeeter and Meagher to operate, through the medium of the Development Company, a cemetery association for profit in a manner contrary to law.
On the same day that the Management Company contract was entered into, there was also executed an agreement between the Development Company and the Cemetery Association. Meagher signed on behalf of the former, and DeGeeter on behalf of the latter. That agreement, marked C-2 in evidence, was one of the contracts held to be illegal in the earlier opinion of this court.
That agreement recited that the Development Company by deed of even date, had conveyed to the Cemetery Association 98 acres of land, which was to constitute the cemetery. This recital was false and not in accord with the facts. The Cemetery Association did not acquire the lands until a later date as will hereinafter appear. As a matter of fact the Development Company did not have title to the Brewster and Oakland tracts on September 27th, 1939.
Under the terms of this agreement the Cemetery Association agreed to pay to the Development Company, as the purchase price, 50% of all money received from the sale of all lots and plots in the property conveyed. The other 50% was to be applied as follows: 10% for a perpetual care fund, and 40% to cover employment of a superintendent, managers, office and other help, the payment of commissions of all kinds, sales, advertising, printing, and all other necessary expenses in the selling, improving, equipping and maintaining the property. Instead of being used for the purposes stated, the *Page 55 
40% was paid to the Management Company as commissions under its exclusive sales contract.
A $5,000 deposit had been made on account of the purchase price of the Brewster tract. The owner of that land refused to convey the property to the Development Company unless Julius DeGeeter, Sr., the father of Frank, went on the bond which was to accompany the $45,000 mortgage to be given on the Brewster tract. Julius DeGeeter, Sr., signed the bond; and the conveyance of the Brewster tract to the Development Company actually took place on September 29th, 1939.
Title to the Oakland tract went directly to Frank DeGeeter on October 4th, 1939. For this title DeGeeter paid $15,000 from his own funds and gave back to the vendor a purchase-money mortgage for $20,000. On the same day that he received the title he conveyed the property to the Development Company, which now held title to both the Oakland and Brewster tracts.
On October 27th, 1939, the Development Company conveyed to the Cemetery Association 98 acres of land which it had carved out of the Oakland and Brewster tracts. These 98 acres were to constitute the cemetery. Under the terms of the conveyance the Cemetery Association assumed and agreed to pay the two mortgages ($45,000 and $20,000) which covered the entire 184 acres that had been conveyed to the Development Company, notwithstanding the fact that only 98 acres went to the Cemetery Association. No money passed from the grantee, the Cemetery Association, to the grantor, the Development Company, in the deal.
On the same day this conveyance was made, a special meeting of the trustees of the Cemetery Association was held at which resolutions were passed authorizing the Cemetery Association to purchase the aforesaid 98 acres of land; to establish a perpetual care fund; and to execute a guaranty to Frank DeGeeter and his father because of the obligations they had assumed with respect to the mortgages covering the Brewster and Oakland tracts.
Work on the cemetery commenced. Money was needed to further the project. The Development Company had no money, neither did the Cemetery Association. An intensive *Page 56 
campaign to sell cemetery lots was inaugurated. The Management Company went into action. Sales resulted in the payment of approximately $250,000 in commissions to it. DeGeeter participated in these commissions to the extent of 2 1/2% of all moneys collected. The nominal head of the Management Company was Meagher, Jr., a young man 21 years old, with little or no business experience. However, the testimony shows that the company was in fact controlled by his father, the defendant George E. Meagher.
In addition to the commissions paid to the Management Company, the Cemetery Association, pursuant to the provisions of C-2, either paid or credited to the Development Company the sum of approximately $140,000.
The operations of the parties under Exhibit C-2 as herein outlined were palpably illegal and on the advice of their then counsel an effort was made to correct the situation, which effort, in my opinion, was inefficacious.
A change was effected in this manner. The Cemetery Association, by DeGeeter, its president, and the Development Company, by Meagher, its president, entered into an agreement dated "as of October 27th, 1939," the date of the conveyance of the 98 acres from the Development Company to the Cemetery Association. In reality the agreement was executed in April or May of 1942, and is the same agreement, marked in evidence as Exhibit C-7, which the court declared illegal in its earlier opinion.
That agreement recited that the Development Company was the owner of 98 acres of land suitable for development as a cemetery; that the Borough of Paramus, by ordinance approved on August 23d 1939, had authorized the establishment of a cemetery or memorial park upon the tract; and that the Cemetery Association desired to purchase the land and the Development Company was willing to sell the same upon the terms and conditions set forth in the agreement.
Under the terms of the contract the Development Company agreed to convey to the Cemetery Association the 98-acre tract. It also agreed to discharge or procure releases for the two mortgages, aggregating $65,000, encumbering portions of the tract as above indicated. The Cemetery Association agreed *Page 57 
upon completion of the conveyance to lay out the land in cemetery blocks and lots. It also agreed that in consideration of the conveyance of the 98-acre tract, and in exchange therefor, it would convey to the Development Company, by deed or deeds in appropriate form, 35,136 cemetery lots and plots, which the Development Company agreed to accept in exchange for the 98 acres.
The agreement also gave to the Cemetery Association the right to exercise three options covering 12 blocks of cemetery lots for a stated consideration, and the Development Company agreed it would not offer any cemetery lots or plots for sale without first offering them to the Cemetery Association at a price per plot not to exceed 50% above the average selling price per plot established by the most recent sale by the Development Company to the Cemetery Association, with the proviso that the Development Company should have complete discretion as to the number of cemetery lots or plots to be included in a single offering to the Association, and with the further proviso that any cemetery lots or plots so offered and not accepted and paid for within two weeks from the date of the offer should be released from all further sales restriction.
I need not repeat here the reasons which led the court to hold this agreement, C-7, just as invalid as its predecessor, C-2.
When the agreement, C-7, was executed, the 98-acre tract was already owned by the Cemetery Association. The two mortgages, which were recited as being open, had, in fact, been paid off by the Cemetery Association out of the moneys credited on its books for the Development Company. The 35,136 cemetery lots and plots which the Cemetery Association agreed to convey to the Development Company in exchange for the 98 acres, constituted the entire tract and was equivalent to the 34 blocks mentioned in the agreement. With respect to the three options for the 12 blocks of cemetery lots also mentioned in the agreement, the fact is that graves in these blocks already had been sold to the public and interments made therein.
In furtherance of the new plan of operations as indicated inC-7, the Cemetery Association, by a form of cemetery deed, *Page 58 
unrecorded, conveyed the right of sepulchre in the entire 98-acre tract to the Development Company. The decree of this court dated February 17th, 1947, has divested the Development Company of this control so that now the fee to the cemetery lands, including the right of sepulchre, is vested in the Cemetery Association. There are now more than 4,000 lot owners in the Cemetery Association.
Except for the transactions had with the Cemetery Association, the Development Company has done no other business since its inception.
The Development Company now demands to be paid for the cemetery lands, valued as such, as of October 27th, 1939, the date of the conveyance to the Cemetery Association. In support of its position, four real estate experts were produced who testified as follows:
Edward J. Lavoie valued the 98-acre tract, as of October, 1939, at $10,000 an acre, or a total of $980,000. He testified he saw the land in 1938 and 1939, and admitted it was then virtually a wilderness. In reaching his valuation he assumed there were 26,700 four-grave lots in the cemetery. He ascribed to each unit of four graves an assumed average sales price of $250 per unit. A sale of all the lots over a period of years (variously estimated by the different experts) would bring in the sum of $6,675,000. A formula used by the witness allocated 15% of that figure as the "land cost." Fifteen per cent. of $6,675,000 is $1,001,250 which, the witness claimed, supported his valuation figure of $980,000.
On cross-examination it developed that the witness assumed ownership of the land in the Cemetery Association, and that the figure he testified to was, in his opinion, the fair price the Cemetery Association should receive for the land.
This witness was followed by another expert, Albert J. Jenkins, of Pittsburgh. He inspected the cemetery in September, 1946. His valuation of the 98-acre tract, as of October, 1939, was $8,820,000. In arriving at this figure he assumed that the tract could be divided into 29,400 units of four-grave lots and that each unit could be sold over a period of years at an average price of $300. He then took 10% of $8,820,000 as his "land cost" and arrived at a figure of *Page 59 
$882,000 which, in his opinion, represented the price to be paid by the Cemetery Association to the owner of the land.
Another expert, Ross D. Rosenberger, also from Pennsylvania, visited the cemetery with Jenkins in September, 1946. He valued the 98-acre tract, as of October, 1939, at $1,029,000. This witness assumed that 24,500 four-grave lots could be carved out of the 98 acres and that each lot could be sold over the years at an average price of $300, which would produce a figure of $7,350,000. He then estimated certain fixed and variable expenses at $6,321,000 which, subtracted from $7,350,000, resulted in his valuation figure of $1,029,000.
Meagher's testimony on the value of the 98 acres, as of October, 1939, was also in excess of $1,000,000.
What these experts did was to assume an ideal situation in which all of the lots in the cemetery would be sold over a period of years (ranging from 25 to 35) at the prices estimated by them. They then took 10 or 15% of that total and labeled it as the price the Cemetery Association should be required to pay for the land in its unimproved condition as of the date of conveyance in October, 1939.
In arriving at their figures these experts used a formula in which percentages were arbitrarily allocated for certain purposes. Thus, Lavoie's formula allowed 35% for sales costs; 25% for development costs; 10% for perpetual care; 15% for land costs; and 15% for cemetery operations. The percentages used by the other experts varied but the general scheme was the same.
There is no need to recite here the values these same experts placed on the land as of January 1st, 1946, except to say that in each instance they were higher than the October, 1939, values.
While on the subject of values it is pertinent to note that Meagher, in a financial statement, valued the cemetery lands (he claims only the Oakland tract), with permit attached, at $300,000. It is to be observed that the three options set forth in Exhibit C-7, which covered 12 blocks of cemetery lots (being approximately one-third of the cemetery, there being 34 blocks in all) called for a payment by the Cemetery Association to the Development Company for the 12 blocks of approximately $104,000. *Page 60 
As contrasted with these figures the complainant produced two witnesses on land value. One witness, Albert H. Kreamer, valued the 98 acres, as of October, 1939, at $56,100. He testified that the land value, in his opinion, would not be enhanced by reason of the existence of a permit for the use of such land as a cemetery.
Complainant's other expert, Gerald F. Dederick, valued the 98 acres, also as of October, 1939, at $50,080. This witness, in arriving at his figure took into consideration sales of comparable properties. He likewise testified that he did not give the land additional value by reason of the existence of a cemetery permit.
My conclusion is that under the facts of this case no award can properly be made to the Development Company. This makes it unnecessary for me to say anything more at this time concerning the values put on this land by its experts.
The cemetery permit cost $50,000. The land $85,000. I fail to see by what feat of legerdemain a combination of the two, ipsofacto, increases the value of the land, in its natural unimproved state, as of the date of conveyance, to $1,000,000 or better.
In my opinion this entire scheme was a gross fraud on our cemetery statute and should not be countenanced. The Development Company was an instrumentality used by the promoters to engage in the cemetery business for profit. Certainly this cannot be done, unless, and until, the present law is changed by legislative enactment.
In support of its position the Development Company cites the cases of Attorney-General ex rel. Bliss v. Linden CemeteryAssociation, 85 N.J. Eq. 501; 96 Atl. Rep. 1001; Dennis v.Glenwood Cemetery, 96 N.J. Eq. 399; 130 Atl. Rep. 373, andFidelity-Union Trust Co. v. Union Cemetery Association,102 N.J. Eq. 100; 139 Atl. Rep. 706. The factual situations existing in those cases differ radically from the facts in the instant case.
In the Bliss Case, which was before this court and the Court of Errors and Appeals on a number of occasions (83 N.J. Eq. 494;91 Atl. Rep. 304; 85 N.J. Eq. 501; 96 Atl. Rep. 1001; 89 N.J. Eq. 192; 107 Atl. Rep. 874; 90 N.J. *Page 61 Eq. 398; 111 Atl. Rep. 224, and 90 N.J. Eq. 400;107 Atl. Rep. 53), Smith, the owner of the land involved in that suit, was a stranger to the transaction. He had no connection with the cemetery association at the time it was organized. The land in question was acquired by Smith more than a year after the cemetery came into being, at a valuation of $37,500. While it is true that he purchased the land for the purpose of selling it to the cemetery association at a profit, the court found that he was in no sense its agent, and that the money he used was his own and not that of the association or its promoters or incorporators. The covenant, pursuant to which Smith was to be paid for the land, having been declared illegal, the court held that Smith was entitled to be paid a reasonable sum in view of the services performed by him and their value to the grantee cemetery association, less any credits to which the grantee was entitled. Subsequently, Smith was awarded the sum of $51,914.07.
In Dennis v. Glenwood Cemetery, supra, Brown was a bonafide owner of the land involved in that suit prior to the incorporation of the Glenwood Cemetery Association. It was decided to convert Brown's farm of 35 acres into a cemetery. Brown interested six of his friends in the project, each of whom paid Brown $1,000 for a one-seventh interest in the property conveyed to them. The seven then incorporated the cemetery association and conveyed to it 29 acres out of the 35-acre tract for a consideration of $21,000. This took place on November 29th, 1895. To provide for the payment of the purchase price the cemetery association issued to the incorporators 42 bonds for $500 each, aggregating $21,000. The principal of the bonds was made payable May 1st, 1922, with interest at 6% payable semi-annually. Payment of the principal and interest on the bonds was resisted by the association on the ground that the bonds were fraudulently issued to pay the incorporators, as promoters, a secret profit of 200% on their investment of $7,000. The court found that there was no proof of any fraudulent conduct on the part of any of the incorporators in issuing the bonds, or in any other transaction relating to the cemetery; also that the proofs failed to show that the incorporators were promoters within *Page 62 
the legal meaning of that term and that, as such, they were chargeable with having made an excessive or secret profit.
In Fidelity Union Trust Co. v. Union Cemetery Association,supra, the question for decision was the validity of a mortgage given by the cemetery association to the Fidelity Union Trust Company, as trustee, to secure $1,000,000 worth of bonds, most of which went to the promoter Renner, who in turn sold them to the public at varying prices below par. Default having occurred, the bondholders directed the trustee to foreclose the mortgage. The court observed that the general scheme of the promoter might not have been inimical to our Cemetery Act had it been carried out to a going and sustained cemetery, but that the manner of promotion and the issuance of negotiable bonds for the consideration was a gross fraud on the statute. However, since the cemetery had kept the cemetery lands, the court held it should account for the reasonable value thereof. With respect to Renner's interest, the court found that he was entitled to a vendor's lien and that such lien could find expression in a mortgage and that the mortgage was to be considered valid only to the extent of the consideration that actually passed to the cemetery association.
The promotional scheme in that case, the work actually done by the promoter, his subsequent bankruptcy, the financial condition of the cemetery, and the intervening rights of bondholders who later surrendered their bonds for certificates of indebtedness, clearly distinguish it from the one under consideration.
In its brief the Development Company takes the position that it was in fact the owner and grantor of the lands conveyed to the Cemetery Association; that it acquired the lands before the Cemetery Association was organized; that it arranged for and secured the cemetery permit or franchise; that it paid for the permit out of its own funds; and that it prepared and paid for the plans and surveys for the laying out of the cemetery, its buildings, embellishments and roadways. It contends that the Cemetery Association is now estopped to deny that the Development Company should be paid for the lands taken; that the Development Company is *Page 63 
not a dummy for Meagher and DeGeeter; and that it is not guilty of any fraudulent conduct in the premises.
These assertions find no support in the proofs. The Development Company was used to perpetrate a fraud on the Cemetery Association and its lot owners. In such a case equity disregards the corporate fiction. The Development Company was in fact Meagher and DeGeeter who, through the use of that instrumentality, sought to realize huge profits from the operations of the Cemetery Association. The agreements which set forth the modus operandi to accomplish this purpose were stricken down by this court and declared to be void and against the public policy of the state. The mere fact that the Development Company acquired a corporate status a few months prior to the organization of the Cemetery Association is of no avail. Both were owned and controlled by Meagher before DeGeeter entered the picture. Thereafter, both entities were treated as one joint enterprise, on a 50-50 basis, by both promoters. And the mere fact that there are other stockholders of the Development Company (they being Realty Affairs, Inc., and Walter S. Wright, Jr., owners of 12 1/2% of the common stock of the company, with a par value of one mill per share) does not change the situation. In the case of Burke v. Gunther, 128 N.J. Eq. 565; 17 Atl. Rep. 2d 481, the principles of which govern this case, the court said with reference to innocent purchasers for value of stock of the development company there involved: "It may be objected that there are some innocent purchasers for value of the stock of the development company, but this we cannot conceive to have any weight. The purpose of the scheme and the formation of the development company was so patently an attempt to make a profit that no purchaser of the development company stock could claim to be an innocent purchaser for value without notice. Each of them must have bought with his eyes open."
The Development Company was not a bona fide owner of the lands it conveyed to the Cemetery Association. It was merely the receptacle used by the promoters to hold the legal title to the cemetery lands. Meagher testified he considered himself and DeGeeter equal partners in the Cemetery Association *Page 64 
and the Development Company. Exhibit C-11 establishes beyond question the partnership arrangement of the promoters. The corporate records of the Development Company fail to show any resolutions authorizing anyone to negotiate for the purchase of the property or take other steps that would give some semblance of credibility to the claim of the Development Company.
The only money that ever went into the treasury of the Development Company, other than money received from the Cemetery Association, was the sum of approximately $14,000 paid by Walter Bass for 140 shares of common and 140 shares of preferred stock. Out of this money Meagher, by checks of the Development Company, paid $5,000 on the Brewster tract and $5,000 on account of the cemetery permit. However, when Bass surrendered his stock to the Development Company he received nothing from that corporation for the shares turned in, but instead received from the Cemetery Association a number of cemetery lots equal in value to what he had paid for the stock. Thus, we find that cemetery money or property was used to repay Bass what he had paid the Development Company for its stock.
Operations under Exhibit C-2 resulted in the Cemetery Association paying to, or crediting the Development Company with, the sum of approximately $140,000. This money was used to pay off the mortgages aggregating $65,000 on the Brewster and Oakland tracts. Meagher and DeGeeter also got some of this money. This sum of $140,000 represented the Development Company's share of sales of cemetery lots made pursuant to the provisions of the void agreement, Exhibit C-2. It was the money realized from the sale of cemetery lots that paid for the land and all expenses incidental to bringing the project to fruition.
The Development Company's claim that it acquired the lands before the Cemetery Association was formed is not borne out by the evidence. The Cemetery Association, as heretofore stated, was formed by Meagher in July, 1939. The Brewster tract was not conveyed to the Development Company until September 29th, 1939, and the Oakland tract not until October 4th, 1939. The conveyance from the Development Company *Page 65 
to the Cemetery Association took place on October 27th, 1939.
Nor is there any basis for the claim that the Development Company procured the cemetery permit and paid for it out of its own funds. In the first place, and as a matter of law, no permit could issue to the Development Company. Moreover, when Meagher was asked on whose behalf he made the application for a permit, he answered: "On behalf of myself and my associates, and my company the George Washington Memorial Park Cemetery Company which we were forming." The uncontradicted testimony is that DeGeeter, out of his personal funds, paid the Borough of Paramus $45,000, which represented the balance due for the permit. This payment was made on behalf of the Cemetery Association. It alone could hold such a permit. The Development Company could not own a permit to operate a cemetery, and to say that it applied for and secured the permit and paid for it out of its own funds is a misrepresentation and not in accord with the facts.
In connection with the Development Company's claim that it prepared and paid for the plans and surveys for the laying out of the cemetery, its buildings, embellishments and roadways, suffice it to say that the proof is to the contrary. DeGeeter testified that items of this nature were paid for by the Cemetery Association. In addition to this it is admitted that the work of clearing the lands was done either by DeGeeter personally, or under his supervision. However, the contention is that he was acting for the Development Company in this matter, he being an officer of the company at the time. This overlooks the fact that DeGeeter at the same time was also a trustee of the Cemetery Association. Certainly as an officer of the Development Company, DeGeeter could not be charged with the responsibility of building a cemetery. The record satisfies me that DeGeeter performed the work in question for the benefit of the Cemetery Association.
The Development Company raises the defense of estoppel. It cannot, under the facts of this case, urge that defense as against the cemetery and its lot owners. The parties were not strangers dealing at arms' length. The promoters controlled *Page 66 
both corporations. They were on both sides of the bargaining table. There was an interlocking relationship.
The doctrine of estoppel is well expressed in the case of NewJersey Suburban Water Co. v. Harrison, 122 N.J. Law 189;3 Atl. Rep. 2d 623, wherein the court said:
"In modern usage, equitable estoppel and estoppel in pais are convertible terms, embracing also quasi-estoppel. They embody the doctrine, grounded in equity and justice, that one shall not be permitted to repudiate an act done or position assumed where that course would work injustice to another who, having the right to do so, has relied thereon. * * * It is of the essence of equitable estoppel that one is precluded from taking a position inconsistent with that previously assumed and intended to influence the conduct of another, if such repudiation `would not be responsive to the demands of justice and good conscience,' * * *."
See, also, Brown v. Corn Exchange National Bank and TrustCo., 136 N.J. Eq. 430; 42 Atl. Rep. 2d 474.
The demands of justice and good conscience require that there be a repudiation of the position asserted by the Development Company.
Throughout its brief the Development Company assumes as a fact that it was a separate legal entity in its own right; that it was a bona fide owner of the lands that went to the Cemetery Association; that it was entitled, as though it were a stranger to the transaction, to convey those lands to the Cemetery Association at a huge profit; and that its conduct was not fraudulent in any respect.
While it may be conceded that a stranger may acquire lands for the purpose of sale to a cemetery at a profit and that such a transaction would not of itself be fraudulent, yet that presupposes a factual situation entirely foreign to the one presently under consideration. Here the Development Company was not at any time a bona fide owner of the lands. It merely held the legal title, which was conveyed to the Cemetery Association pursuant to agreements which this court has declared illegal, under the terms of which agreements the promoters hoped to extort huge profits from the operations of the cemetery and to share the same under the protective cloak of a *Page 67 
corporation. This constituted a fraud not only on the cemetery statutes of this state but also on a charitable trust, the Cemetery Association, and its lot owners, the beneficiaries of that trust.
Before leaving the claim of the Development Company it should be borne in mind that the total acreage acquired by it was approximately 184 acres. The total purchase price was $85,000. The property, as indicated, was encumbered by two mortgages totaling $65,000. These mortgages were paid and satisfied out of moneys which were credited to the Development Company's account under the illegal contract, Exhibit C-2. The total of the moneys paid or credited by the Cemetery Association under that contract was in excess of $140,000. When it is considered that the land investment did not exceed $20,000 ($15,000 of which was paid by DeGeeter on the Oakland tract and $5,000 on the Brewster tract) it would appear that the Development Company realized a fair return on its investment and wound up as the owner of a large tract of land — the difference between what it acquired, and the 98 acres conveyed to the Cemetery Association, free and clear of the mortgage liens.
Meagher and DeGeeter, as the promoters of the enterprise, could not, under the facts of this case, have bought the land for the consideration stated ($85,000) and turned it over to the Cemetery Association at a fabulous price. What they could not do directly, the law will not permit them to do through the guise or medium of a corporation owned and controlled by them.
Since a cemetery association under our law is a charitable trust, it cannot be operated at a profit for the benefit of others. The beneficiaries of this trust are the lot owners. A scheme, whereby promoters cause lands to be taken in the name of a corporation controlled by them, and then cause the lands to be conveyed to a cemetery association likewise controlled by them, pursuant to an agreement which contemplated operating the cemetery at a profit and in a manner contrary to law, is fraudulent. And where, as in this case, the moneys that were used to pay for the land arose from the sale of cemetery lots, which moneys were paid or credited to the grantor corporation *Page 68 
under the terms of an illegal agreement, there can be no award to such corporation, it being merely the nominal holder of the legal title for the convenience of the promoters.
In considering the claims of Meagher and DeGeeter on their respective counter-claims, it is to be remembered that these men, as promoters, bore a fiduciary relationship to the enterprise. The dealings of a promoter with the company which he organizes are subject to the same scrutiny as the dealings between trustee and cestui que trust. The burden is always on the promoter (trustee) to show that his dealings with the company (cestui) are fair and honest, and that no advantage has been taken as a result of the trust relation. Allenhurst Park Estates v.Smith, 101 N.J. Eq. 581; 138 Atl. Rep. 709. A trustee will not be permitted to take a position antagonistic to his trust.Taylor v. Errion, 137 N.J. Eq. 221; 44 Atl. Rep. 2d 356;Camden Trust Co. v. Cramer, 136 N.J. Eq. 261; 40 Atl. Rep.
2d 601. The contract of a trustee enures to the benefit of his principal. Schenck v. Davis, 134 N.J. Eq. 375;35 Atl. Rep. 2d 681.
It is admitted that DeGeeter advanced the sum of $60,000 which was used to pay the balance due on the cemetery permit and part of the purchase price of the Oakland tract. These payments were made by DeGeeter personally and I find they were made on behalf of the Cemetery Association.
It is contended that DeGeeter advanced the $60,000 to the Development Company for stock and thereby became a stockholder and that his rights in this case are limited to that of a stockholder of the Development Company. The evidence does not bear this out. There was no stock subscription. C-11 supplies the information that DeGeeter was to advance this money as acapital investment to the enterprise. It was to be used to buy the land and secure the cemetery permit. For this he was to receive "common and/or preferred and common stock." The concluding paragraph of Exhibit C-11 provided that if the State Board of Health should reverse the Borough of Paramus and prohibit the establishment of the cemetery that then the agreement should be of no effect. Meagher's guaranty, annexed toExhibit C-11, also negatives the idea that the $60,000 was advanced by DeGeeter as an *Page 69 
investment in stock of the Development Company. Moreover, this money never found its way into the treasury of the Development Company. In my opinion the stock was taken by DeGeeter as collateral security for the moneys advanced to the enterprise. It would appear that the common stock was the means utilized by the promoters to share the profits flowing to the Development Company out of the operations of the Cemetery Association and that the preferred stock and Meagher's guaranty were given to DeGeeter as security for an advance of the funds to the joint enterprise.
DeGeeter says the cemetery permit would not have been issued had he not entered the picture. He said that the borough officials, in an effort to prevent the spread of a certain type of housing development, were agreeable to the issuance of a permit, but that they wanted to be satisfied concerning the financial responsibility of the applicant. DeGeeter further testified that the actual plans for the layout of the cemetery were not completed until late in 1942; that the physical labor which went into the project was performed by himself and by others under his supervision; that it was he who consulted with engineers and architects and worked with them to make the cemetery a reality; that all labor and other expenses of the operation were paid for by the Cemetery Association; that all of the equipment, such as bulldozers, trucks, c., needed to do the work were purchased or hired by the Cemetery Association and paid for by it; and that Meagher's only interest in the cemetery centered around the sales of cemetery lots; also, that it was he who finally succeeded in procuring title to the Oakland tract and in inducing the owner of the Brewster tract to convey it to the Development Company.
Meagher admitted that the expenditures concerning which DeGeeter testified, were in fact made by the Cemetery Association, and there is no denial of DeGeeter's story that he personally performed and supervised the actual work of building the cemetery.
For the work done DeGeeter received no compensation until 1943. On December 1st of that year he was voted a salary of $6,000 per annum as president of the Cemetery Association. As of December 1st, 1946, his salary was increased to $12,000 per annum. *Page 70 
His claim is for reimbursement for the $60,000 actually advanced to the enterprise, with interest, also for $25,000 a year from September, 1939, to September, 1943, with interest, and compensation for the risk he took in making the investment.
The complainant, in its brief, contends that its liability to DeGeeter should be limited to a return of his $60,000 without interest and that he should be paid $6,000 a year, also without interest, for the period during which he worked for the Cemetery Association and received no compensation therefor. This figure is calculated by the complainant at $25,300. The $6,000 figure used by complainant is based on the salary paid to DeGeeter from December 1st, 1943, to December 1st, 1946, and is submitted as a fair yardstick of the value of DeGeeter's services. Objection is made to any allowance for the risk incurred by DeGeeter, attention being called to commissions paid to him under the Management Company contract, which amounted to $12,112.64. Complainant also calls attention to the fact that DeGeeter received $30,000 (in reality $30,150) from the Development Company for the retirement of 150 shares of preferred stock, and that this should be deducted from the $85,500 figure, leaving a net award of $55,500.
Counsel for Meagher, in their brief, mention other items which have a bearing on DeGeeter's claim. It appears that both Meagher and DeGeeter voted themselves salaries of $36,000 per annum as officers of the Development Company. These salaries were not actually paid to them and were disallowed by the Internal Revenue Department. However, it appears from the books of the Development Company that there was paid to DeGeeter $5,311.98 to enable him to pay income taxes on the salary voted to him, and for a like purpose $7,587.26 was paid to his nominee, Julius DeGeeter, and $7,000 to Meagher.
I believe that DeGeeter is entitled to an award in this case, There is no doubt that he performed and supervised the actual physical work of bringing the cemetery to fruition. The testimony convinces me that he acted in entire good faith in the premises. He recognized the delicacy of his position and, *Page 71 
after being informed sometime in 1941, by his then counsel, that the arrangement under which the enterprise was being carried on was illegal, he turned his back on the scheme that would have resulted in huge profits going to the Development Company had not the illegal contracts, Exhibits C-2 and C-7, been struck down by this court, and devoted his time exclusively to the interests of the Cemetery Association.
However, he cannot be permitted to make a profit out of the trust relationship. He is entitled to a return of the $60,000 advanced by him plus the sum of $50,000 which I deem to be a fair figure for the work done on behalf of the Cemetery Association from September, 1939, to September, 1943, and for which he has not been compensated. No interest will be allowed on these sums, nor will any compensation be awarded for the risk in making the investment. The moneys advanced by him were sufficiently secured and in my opinion the risk assumed was negligible.
From the total of $110,000 there should be deducted the $30,150 DeGeeter received from the Development Company; the $12,112.64 received as commissions under the Management Company contract; and also the sum of $12,899.24 representing the moneys he and his nominee received from the Development Company to pay income taxes on the salary voted to him. It also appears that in addition to the foregoing items he also received $300 as a salary in 1942 from the Management Company. These deductions total $55,461.88 which, subtracted from the award of $110,000, leave a balance of $54,538.12 due him.
Payment of this sum to DeGeeter must not be permitted to interfere with the normal operations of the cemetery, nor with the maintenance of the perpetual care fund. I direct, therefore, that one-half of the proceeds of sales of lots and plots shall be set aside for the payment of the amount due. Fidelity UnionTrust Co. v. Union Cemetery Association, 104 N.J. Eq. 326;145 Atl. Rep. 537; Burke v. Gunther, 128 N.J. Eq. 565;17 Atl. Rep. 2d 481.
Meagher wants to be compensated for the value of the services he rendered in furtherance of the project, and to be reimbursed for his cash outlay. He argues that the award, *Page 72 
regardless of whether it goes to the Development Company or to the individual promoters, should be based on the value of the cemetery lands as of January, 1946, when the bill of complaint in this cause was filed, when, it is claimed, the scheme broke down; or, in the alternative, as of October 27th, 1939, the date of the conveyance of the lands from the Development Company to the Cemetery Association. Acceptance of this proposition, and adoption of the valuation figures put on this land by Meagher's experts, would result in an award of over $1,000,000 to the individual promoters, which, it is needless to say, will not be countenanced. The facts of this case bring it within the principles enunciated in Burke v. Gunther, supra.
It is argued on Meagher's behalf that the rules respecting promoters making a secret profit have no application here, and that the doctrine should not be extended to the extent of restraining or prohibiting the promoter from enjoying his legitimate profit or reaping the honest reward of his labor. With this latter proposition there can be no quarrel. But the facts of this case compel the application of the rule which prohibits a promoter from making a secret profit. Meagher and DeGeeter bore a fiduciary relationship to the Cemetery Association. Through the medium of their brain child, the Development Company, they attempted to unjustly enrich themselves at the expense of a charitable trust which they likewise created, brought into being and controlled. If the rule circumscribing the activities of a promoter applies, as it does, to an ordinary business corporation, it applies with equal, if not greater, vigor to his dealings with a charitable trust. Moreover, the evidence shows that the rights of third parties immediately intervened in this case. Sales of cemetery lots took place before the cemetery was laid out and even before the cemetery permit had been issued. These sales were termed by Meagher as "preorganization" sales.
Meagher testified that in 1932, he first got the idea of developing a cemetery to serve the metropolitan area. That after canvassing different areas, he finally settled on the Paramus site in 1934; that he negotiated the option on the Brewster and Oakland tracts; that he did considerable work in *Page 73 
overcoming objections to the issuance of a cemetery permit; and that he finally succeeded in having the permit issued in August, 1939. He also testified he did considerable paper work in preparing the layout of the cemetery; that he consulted with architects and engineers; and that he brought over from his other cemeteries the experienced men needed to commence the actual construction of the cemetery itself.
He claims that this work extended over a period of ten years; that from 1932, when he first conceived the idea, until 1939, he spent about one-third of his time in this endeavor; and that from 1939 until April 1st, 1943, he spent about one-half of his time. In payment for the services performed during this period he wants $170,000, and for his cash outlay of $38,652.50 he asks reimbursement. He asks, in addition, to be compensated for the risk he assumed in the enterprise and a profit.
Meagher produced as a witness on his behalf, Albert R. Winans. Winans resides in Ridgewood, New Jersey, and is a real estate broker with thirty years' experience. He testified he first met Meagher in the early part of 1932 in connection with a survey to be made of a place to locate a cemetery in the metropolitan area; that the idea of locating a cemetery in Bergen County originated with him and that he procured Meagher's services after negotiating with a number of other people; that they decided when the Development Company was formed, Realty Affairs, Inc., Winan's company, would receive 10% of its stock for the services rendered by Winans in conducting negotiations for a cemetery permit and for assisting in bringing about a new memorial park for Bergen County. He also testified that this agreement, relating to the Paramus site, was made in 1938; and that his activity with Meagher preceding that time and going back to 1932, related to another deal. He asserted he spent money for pictures showing the park as it would appear when completed.
On cross-examination, Meagher's attention was directed to two undated statements "gotten up" by him (Exhibits D-G-2 andD-G-3 in evidence). The first one was headed "PRE-FORMA FINANCIAL STRUCTURE;" and the second one, "APPROXIMATE *Page 74 
PRE-FORMA AFTER FINANCING." These statements referred to no particular cemetery. In one of the exhibits Meagher estimated making a $10,000,000 profit out of the operation of a cemetery over a twenty-year period; and in the other, an estimated profit in excess of $21,000,000 over the same period of time. Questioned concerning these documents Meagher admitted that his original intention was to start a cemetery company in this area on a profit basis.
This and other testimony, coupled with the exhibits, satisfy me that Meagher's activity and services cannot be considered as having been rendered on behalf of the Cemetery Association. It is obvious that Meagher and Winans set to work and spent money, in furtherance of a scheme, more or less indefinite, to establish a cemetery somewhere in the metropolitan area on a profit-sharing basis, such as is permissible in Pennsylvania where Meagher operated the Whitemarsh Memorial Park and Rolling Green Cemeteries.
Illustrative of Meagher's state of mind, and his then intention, is the suit he instituted in this court against the Development Company, Frank DeGeeter, and his brother Julius DeGeeter. In that suit he sought to have the agreement entered into between DeGeeter and himself (Exhibit C-11) specifically enforced. That was the agreement providing for the operation of the Development Company and the Cemetery Association as a joint enterprise. He testified that the services for which he now seeks to charge the Cemetery Association were rendered by him pursuant to Exhibit C-11. Settlement of that litigation resulted in a dismissal of Meagher's bill of complaint on the merits, and a dismissal of DeGeeter's counter-claim thereto without prejudice.
It seems to me that Meagher should not now be permitted to say that the services for which he seeks compensation were rendered by him on behalf of the Cemetery Association. He was in doubt as to who should pay him the $170,000. He testified that compensation should come to him from either corporation. He declared he thought he was performing the services for the Development Company, and admitted that he never presented a bill to the Cemetery Association for money due him. *Page 75 
Meagher's relationship to the sales agency is evident. The George E. Meagher, Jr., Management Company which held the exclusive sales franchise, was a close corporation consisting of Meagher, his son, George, Jr., and his daughter, C. Minna Harper. That this corporation was owned and controlled by the defendant Meagher is amply borne out by the evidence.
At the hearing before this court on November 26th, 1946, Meagher was asked this question on cross-examination:
"Q. Now, Mr. Meagher, so that it may be clear beyond dispute, when the sales company was organized in the name of your son, George E. Meagher, Jr., Management Company, was there any doubt that was your proposition, and entirely yours? A. No, sir."
When the Management Company was summoned before the Securities Exchange Commission on the charge of selling cemetery lots for investment purposes, Meagher was asked these questions by the examiner:
"Q. What was the purpose of this [referring to the Management Company] corporation? A. To act as sales agent for George Washington Memorial Park Cemetery lots, among other things, that the charter would give us permission to do. That was the principal.
"Q. Is it fair to say that it is your company? A. Yes, sir."
Notwithstanding his admitted ownership of the Management Company, Meagher testified on direct examination that all he received from that source was approximately $500. This was substantiated by the company's accountant, John Bollinger, on his direct examination. However, on cross-examination it developed that in addition to the sum of $557.35 paid to Meagher, that the Management Company also paid him $4,560 for traveling expenses and the like.
It also appears that Meagher participated in the moneys paid to the Management Company through an arrangement made with two of its employees, Miss Margaret Wallis and her sister, Elizabeth. These employees were permitted to withdraw each week, allegedly as salaries, an amount in excess of their true salaries. The excess was subject to the direction of Meagher or his son. Records of the bank where the Margaret Wallis account was kept corroborate the arrangement. *Page 76 
On the whole I am satisfied that Meagher participated, to a greater extent than he would have the court believe, in the moneys that were paid by the Cemetery Association to the Management Company.
A consideration of all the evidence leads to the conclusion that very little of Meagher's work was performed for or on behalf of the Cemetery Association. It is obvious that much of his activity had nothing to do with this particular project. The years preceding 1939 were spent in searching for a site to build a cemetery. It was not until 1938 or 1939, when he and Winans got together on the Paramus site, that anything of a concrete nature developed with respect to the present cemetery. From that point on his efforts could more properly be said to have been expended on behalf of the Development Company and the Management Company. The Cemetery Association as such, was incidental. It was intended, through an illegal arrangement, to realize a huge profit on the lands conveyed to the Cemetery Association, and also, so far as the Management Company was concerned, to get a 40% commission on all lots sold in the cemetery regardless of whether the sale was effected by the Cemetery Association or the Management Company.
Meagher claims to have spent $38,652.50 on the project from 1932 to April 1st, 1943. He testified on November 26th, 1946, that his outlay was $22,900. At a later hearing he reduced this figure to $20,126.58. This amount he stated was expended in the years preceding the issuance of the cemetery permit to the complainant. He further testified that he spent $11,391.92 from, and after, the time the permit was issued.
On cross-examination by the Deputy Attorney-General, Meagher was asked to explain the discrepancy between a claim of $22,000 asserted in October, 1946, when he testified before Special Master O'Regan, and his present claim for $38,652.50. The explanation was not at all satisfactory — it appearing that some of the money included in the larger figure represented advances made by him to two of his subsidiary sales organizations, and that other items could not properly be considered as chargeable to the Cemetery Association. *Page 77 
It is difficult to believe that a man of Meagher's experience would permit his out-of-pocket expenses to reach such proportions and then wait years before asking for reimbursement. The business world does not operate that way; and, frankly, I do not believe that Meagher operates in that manner. Indicative of this is the fact that in October, 1939, he billed the Cemetery Association for out-of-pocket expenses totaling $752.07, which he received, and also billed the Development Company, for a like purpose, for $211.07.
My conclusion is that Meagher can take nothing under his counter-claim. I was not at all impressed with some of his testimony and that of his witnesses. The testimony in important particulars, submitted in his behalf, was vague, indefinite, and self-contradictory, and lacked credibility. Under the circumstances his counter-claim will be dismissed.
A decree, in accordance with the views herein expressed, may be presented. *Page 78